Case No. 15-5163

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

KENTUCKY COAL ASSOCIATION; JAMES ROGERS, III;
J.L. ROGERS FAMILY LLC; TALMAGE ROGERS;
TALMAR OF FL, LLC; PAT EARLY; KIRSTINE EARLY;
BUCKINGHAM HOLLOW, LLC; KEVIN LAWRENCE;
BIG BUCKS, LLC

Plaintiffs-Appellants

v.

TENNESSEE VALLEY AUTHORITY

Defendant-Appellee

On Appeal from the United States District Court for the
Western District of Kentucky

**BRIEF OF DEFENDANT-APPELLEE TENNESSEE VALLEY AUTHORITY**

May 6, 2015

Edwin W. Small, *Deputy General Counsel*
Maria V. Gillen, *Senior Attorney*
Frances Regina Koho, *Attorney*
TVA GENERAL COUNSEL'S OFFICE
400 West Summit Hill Drive
Knoxville, Tennessee 37902-1401
Telephone 865.632.2410

Attorneys for Tennessee Valley Authority

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT REGARDING ORAL ARGUMENT ........................................ viii

JURISDICTIONAL STATEMENT ...................................................... 1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ........................... 2

STATEMENT OF THE CASE ........................................................... 3

    Factual Background ............................................................... 4

    Procedural Background .......................................................... 11

STANDARD OF REVIEW ............................................................. 12

SUMMARY OF THE ARGUMENT .................................................... 14

ARGUMENT .......................................................................... 15

I.    TVA's Integrated Resource Plan Satisfies the Energy Policy Act's Least-Cost Planning Directive and Supports TVA's Subsequent Site-Specific Decision at Paradise. ................................. 15

    A.    The Energy Policy Act of 1992 ................................. 15

    B.    TVA's Integrated Resource planning process properly implements the Energy Policy Act's "least cost" directive. ...... 17

    C.    Kentucky Coal's criticisms of TVA's least-cost planning activities ignore the comprehensive nature of the Energy Policy Act's planning directives. ............................. 22

    D.    The site-specific decision to retire Paradise Units 1 and 2 is supported by the broad goals of the 2011 IRP. .................... 27

II.    TVA's Site-Specific NEPA Review of the Paradise Project Properly  Tiered from the IRP and Complied with NEPA. ............... 32

i

A.   Statutory framework ........................................................32

B.   TVA did not segment the Paradise NEPA review or "shunt" evaluations to FERC. ...................................33

C.   TVA analyzed effects on various resources along the proposed pipeline routes. ...........................................38

     1.   Floodplains and wetlands ................................39

     2.   Threatened/endangered species ......................43

     3.   Historic/cultural properties .............................44

D.   TVA did not predetermine its decision. ...................46

E.   TVA's decision to prepare an EA and FONSI was appropriate. ........................................................47

     1.   Preparation of an EA for the Paradise project is consistent with TVA's past practice. .............48

     2.   TVA's examination of context and intensity properly lead to a finding of no significance. ................55

CONCLUSION ........................................................................57

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

APPELLEE TENNESSEE VALLEY AUTHORITY'S DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

# TABLE OF AUTHORITIES

**Cases**                                                                   **Page**

*Auer v. Robbins*,
  519 U.S. 452 (1997).................................................................. 50

*Breckinridge v. Rumsfeld*,
  537 F.2d 864 (6th Cir. 1976) ................................................. 57

*Camp v. Pitts*,
  411 U.S. 138 (1973).................................................................. 12

*Citizens Advisory Comm. on Private Prisons v. U.S. Dep't of Justice*,
  197 F. Supp. 2d 266 (W.D. Pa. 2001).......................................47, 50

*Citizens' Comm. to Save Our Canyons v. Krueger*,
  513 F.3d 1169 (10th Cir. 2008) ............................................... 13

*City of Cleveland v. Ohio*,
  508 F.3d 827 (6th Cir. 2007) ................................................... 12

*City of Dallas v. Hall*,
  562 F.3d 712 (5th Cir. 2009) ................................................... 49

*Coal. for Advancement of Reg'l Transp. v. Fed. Highway Admin.*
  576 F. App'x 477 (6th Cir. 2014) ...................................... 8, 12, 37

*Comm. to Preserve Boomer Lake Park v. Dep't of Transp.*,
  4 F.3d 1543 (10th Cir. 1993) ................................................49-50

*Ctr. for Biological Diversity v. Abraham*,
  218 F. Supp. 2d 1143 (N.D. Cal. 2002)...................................... 15

*Del. Audubon Soc'y v. Salazar*,
  829 F. Supp. 2d 273 (D. Del. 2011)........................................... 56

*Dep't of Transp. v. Pub. Citizen*,
  541 U.S. 752 (2004)................................................................... 22

## Cases (continued)                                      Page

*Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.*,
   451 F.3d 1005 (9th Cir. 2006) ........................................................ 37

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) ..................................................................... 53

*Friends of Fiery Gizzard v. Farmers Home Admin.*,
   61 F.3d 501 (6th Cir. 1995) ..................................................... 33, 48

*Friends of the Clearwater v. Dombeck*,
   222 F.3d 552 (9th Cir. 2000) ........................................................ 47

*Goodman Grp., Inc. v. Dishroom*,
   679 F.2d 182 (9th Cir. 1982) ........................................................ 57

*Greater Yellowstone Coal. v. Flowers*,
   359 F.3d 1257 (10th Cir. 2004) ............................................... 33, 48

*Hirt v. Richardson*,
   127 F. Supp. 2d 833 (W.D. Mich. 1999) ....................................... 38

*Hospira, Inc. v. Burwell*,
   No. GJH-14-02662, 2014 WL 4406901 (D. Md. Sept. 5, 2014) ...... 53

*In re Permian Basin Area Rate Cases*,
   390 U.S. 747 (1968) ..................................................................... 32

*In re Texas Gas Transmission, LLC*,
   CP15-105-000 (FERC Mar. 4, 2015) ......................................... 4, 35

*Karst Envtl. Educ. & Prot. v. Fed. Highway Admin.*,
   No. 1:10-CV-154-R, 2011 WL 5301589 (W.D. Ky. Nov. 2, 2011) ....... 37

*Kentuckians for the Commonwealth v. U.S. Army Corps of Eng'rs*,
   746 F.3d 698 (6th Cir. 2014) ........................................................ 13

*Kentuckians for the Commonwealth v. U.S. Army Corps of Eng'rs*,
   963 F. Supp. 2d 670 (W.D. Ky. 2013) ........................................... 12

*Klein v. U.S. Dep't of Energy*,
   753 F.3d 576 (6th Cir. 2014) ........................................................ 48

## Cases (continued)                                              Page

*Kleppe v. Sierra Club*,
    427 U.S. 390 (1976) .......................................................................... 12

*Latin Americans for Soc. & Econ. Dev. v. Fed. Highway Admin.*,
    756 F.3d 447 (6th Cir. 2014) ........................................................... 12

*Local 3-689, Oil, Chem. & Atomic Int'l Union v.*
    *Martin Marietta Energy Sys., Inc.*,
    77 F.3d 131 (6th Cir. 1996) ............................................................. 15

*Nat'l Audubon Soc'y v. Dep't of the Navy*,
    422 F.3d 174 (4th Cir. 2005) ........................................................... 46

*Providence Rd. Cmty. Ass'n v. EPA*,
    683 F.2d 80 (4th Cir. 1982) ....................................................... 33, 47

*Pure Waters, Inc. v. Mich. Dep't of Natural Res.*,
    No. 95-1489, 1996 WL 180178 (6th Cir. Apr. 15, 1996) ................. 58

*Robertson v. Methow Valley Citizens Council*,
    490 U.S. 332 (1989) .......................................................................... 32

*Save Our Cumberland Mountains v. Kempthorne*,
    453 F.3d 334 (6th Cir. 2006) ........................................................... 12

*Sierra Club v. Slater*,
    120 F.3d 623 (6th Cir. 1997) ....................................................... 22, 38

*Sierra Club v. Wagner*,
    555 F.3d 21 (1st Cir. 2009) .............................................................. 47

*Sigmon Fuel Co. v. TVA*,
    754 F.2d 162 (6th Cir. 1985) ........................................................... 49

*Stew Leonard's v. Veneman*,
    32 F. App'x 606 (2d Cir. 2002) ....................................................... 52

*St. Marys Cement Inc. v. EPA*,
    782 F.3d 280 (6th Cir. 2015) ................................................ 13, 26, 32

**Cases (continued)**         **Page**

*Tenn. Envtl. Council v. TVA*,
  32 F. Supp. 3d 876 (E.D. Tenn. 2014)............................................. 46

*Thomas Jefferson Univ. v. Shalala*,
  512 U.S. 504 (1994)........................................................................ 50

*United States v. Chem. Found., Inc.*,
  272 U.S. 1 (1926)............................................................................ 34

*Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*,
  435 U.S. 519 (1978).................................................................. 32, 55

*White Stallion Energy Ctr., LLC v. EPA*,
  748 F.3d 1222 (D.C. Cir. 2014)........................................................ 4

**Statutes and Rules**

Pub. L. No. 102-486, 106 Stat. 2776, 2798 .................................. 6, 16
16 U.S.C. §§ 831-831ee ............................... 1, 4, 6, 16, 18, 19, 20
5 U.S.C. § 706 ..................................................................................... 12
15 U.S.C. § 717f................................................................................. 34
15 U.S.C. § 717n ............................................................................... 35
28 U.S.C. § 1291 ................................................................................. 1
28 U.S.C. § 1331 ................................................................................. 1
36 C.F.R. § 800.4 ............................................................................... 45
40 C.F.R. §§ 1500.1 to 1508.28.................. 6, 9, 32, 33, 35, 37, 55, 57

**Regulations**         **Page**

Addition of Electric Generating Peaking Capacity
  at Greenfield Sites, Mississippi,
  65 Fed. Reg. 47817-01 (Aug. 3, 2000) ........................................... 51

Addition of Electric Generating Peaking Capacity
  at Greenfield Sites, Mississippi Record of Decision,
  66 Fed. Reg. 21189-01 (Apr. 27, 2001).......................................... 51

Addition of Electric Generation Peaking and Baseload Capacity
  at Greenfield Sites, Haywood County, Tennessee,
  64 Fed. Reg. 29935-02 (June 3, 1999)............................................ 51

**Regulations (continued)**         **Page**

Addition of Electric Generation Peaking Capacity,
   65 Fed. Reg. 30469-02 (May 11, 2000)........................... 51

Class Review of Repetitive Actions in 100-Year Floodplain,
   46 Fed. Reg. 22845 (Apr. 21, 1981) ................................. 40

Guidance Regarding NEPA Regulations,
   48 Fed. Reg. 34263-01 (July 29, 1983) ........................... 50

Integrated Resource Plan,
  Issuance of Record of Decision,
   61 Fed. Reg. 7572-02 (Feb. 28, 1996)..................... 19, 21

Federal Guidance for the Establishment, Use and
  Operation of Mitigation Banks,
  60 Fed. Reg. 58605 (Nov. 28, 1995) ................................ 42

Floodplain Management & Protection of Wetlands;
  Procedures & Draft Implementing Guidelines,
  44 Fed. Reg. 45513 (Aug. 2, 1979) .................................. 39

Hazardous and Solid Waste Management System; Disposal of Coal
  Combustion Residuals From Electric Utilities, Final Rule
  80 Fed. Reg. 21302 (Apr. 17, 2015) ................................. 23

National Emission Standards for Hazardous Air Pollutants
  from Coal- and Oil-Fired Electric Utility Steam Generating Units,
  77 Fed. Reg. 9304, 9439 (Feb. 16, 2012) ..................... 4, 56

**Other Authorities**

Electric Demand-Side Management Under Federal Law,
  13 Va. Envtl. L.J. 57 (1993) ............................................ 16

Integrated Resource Planning: The Case for Exporting
  Comprehensive Energy Planning to the Developing World,
  25 Case W. Res. J. Int'l L. 371 (1993) ............................. 15

Teaching an Old Dog New Tricks: Adapting Public Utility
  Commissions to Meet Twenty-First Century Climate Challenges,
  38 Harv. Envtl. L. Rev. 371 (2014) .................................. 21

## STATEMENT REGARDING ORAL ARGUMENT

TVA does not request oral argument because this appeal can be decided on the Administrative Record and on the facts and legal analysis presented in the briefs; however, should the Court determine that oral argument is warranted, TVA is prepared to address any questions that may aid the Court in its decisional process.

## JURISDICTIONAL STATEMENT

The district court possessed jurisdiction pursuant to 28 U.S.C. § 1331.[1]  This Court possesses appellate jurisdiction over the appeal of the district court's amended final order (RE 55, PageID # 580-608) pursuant to 28 U.S.C. § 1291. Upon issuance of the final order, the district court's denial of Plaintiffs' motion for a preliminary injunction (RE 51, PageID # 508-32) merged with the final order.

---

[1]    TVA argued below that Plaintiffs' Energy Policy Act claim was non-justiciable because 16 U.S.C. § 831m-1 does not provide courts with judicially manageable standards for evaluating least-cost planning programs.  (RE 32-1, PageID # 297-301; RE 49, PageID # 467-72.)  The district court "decline[d] to exercise [the] narrow ['committed to agency discretion'] exception" and denied the claim on its merits. (RE 55, PageID # 605.)

1

**STATEMENT OF THE ISSUES PRESENTED FOR REVIEW**

1.     Whether the district court correctly entered judgment for TVA on Plaintiffs' challenge to TVA's decision to replace coal-fired units at its Paradise Fossil Plant with natural gas generation under the Energy Policy Act of 1992 because TVA's Integrated Resource planning process is a reasoned means to fulfill the Energy Policy Act's least-cost planning directive to comprehensively address necessary features for system operation, including diversity, reliability, dispatchability, and other factors of risk.

2.     Whether the district court correctly entered judgment for TVA on Plaintiffs' challenge to TVA's decision to replace coal-fired units at its Paradise Fossil Plant with natural gas generation under the National Environmental Policy Act because TVA conducted a searching inquiry into the potential impacts of its decision, determined that the replacement would have no significant impact on the environment, and amply supported that determination in an Environmental Assessment and Administrative Record, which tiered from TVA's 2011 Integrated Resource Plan Environmental Impact Statement.

## STATEMENT OF THE CASE

The decision challenged in this case was made after TVA, a federal agency with expertise in the production and delivery of reliable electricity, balanced the competing directives of various statutes—the Energy Policy Act of 1992, the National Environmental Policy Act (NEPA), the Clean Air Act, and, preeminently, the TVA Act. Its decision to replace two coal-fired units with natural gas-fired generating capacity was a reasoned decision, reducing environmental impacts and helping TVA increase the diversity of the generating resources on its electric-power supply system while accounting for future environmental compliance costs, risk, and reliability.

Those who challenge this decision, a coal advocacy group and landowners, most of whom own coal-producing property in Kentucky (collectively, "Kentucky Coal"), poorly disguise their actual objective—to promote the continued use of coal, regardless of its total costs and impacts—with environmental concern. This lawsuit, brought ironically under an environmental protection statute, is but one part of their narrow parochial mission—to fight what they characterize as the "war on coal."[2] In stark contrast, TVA's broad public mission is the "advancement of

---

[2]     *See, e.g.*, *Stop the War on Coal:  EPA's Regulatory Initiatives Impacting the Coal Industry*, *available at* http://www.kentuckycoal.org/documents/whitepapers/Stop%20the%20War%20on%20Coal.pdf.  To further their fight against the "war on coal," the Kentucky Coal

the national defense and the physical, social and economic development" of the Tennessee Valley region.  16 U.S.C. § 831n-4(h).  To help accomplish that mission, Congress authorized TVA to provide electric power to the region, *id*., and TVA does so through an array of energy sources, including coal, nuclear, water, gas, and solar, based on its judgments about how to best accomplish the goals of the TVA Act given a multitude of factors and uncertainties.

### Factual Background

In February 2012, the U.S. Environmental Protection Agency (EPA) issued the Mercury and Air Toxics Standards (MATS), which require operators of coal-fired power plants to reduce hazardous pollutants emitted from their plants by April 16, 2015, or by April 16, 2016, if an extension is granted.  77 Fed. Reg. 9304.  TVA determined that the 1,150-megawatt (MW) Unit 3 at its Paradise Fossil Plant was sufficiently controlled to comply with MATS, but that emissions from the two older 704 MW units would have to be reduced to comply.  (AR 34, 163.)[3]

---

(. . . continued)
Association regularly intervenes in proceedings where the fate of coal's status as a major energy resource is at issue.  *See, e.g.*, Mot. to Intervene, *In re Texas Gas Transmission, LLC*, CP15-105-000 (FERC Apr. 8, 2015); *White Stallion Energy Ctr., LLC v. EPA*, 748 F.3d 1222, 1230 (D.C. Cir. 2014) (per curiam).

[3]     The Administrative Record (AR) of TVA's decision was filed with this Court on April 29, 2015.  (Doc. 21.)

In August 2012, the TVA Board of Directors conditionally approved the budget for several capital projects to address TVA's Clean Air Act obligations, including MATS.  Among them was the installation of additional pollution controls for Paradise Units 1 and 2, conditioned upon the "satisfactory completion of required environmental reviews."  (AR 324, 326.)  These reviews included a NEPA review, which identified the purpose and need for the action as complying with MATS; delivering reliable, cost-effective electricity; minimizing overall costs; maximizing use of existing TVA facilities; minimizing construction of new transmission system components and upgrades of existing transmission system components; and maintaining a balanced portfolio of energy sources.  (AR 34.)

After a year of study and review, TVA published a draft Environmental Assessment (EA) in August 2013, which analyzed the potential impacts of its proposed action and alternatives to it.  (AR 22-150).  Although NEPA does not require public comment on draft EAs, TVA provided for public comment on the Paradise EA.  (AR 1.)  After considering and responding to the comments received, TVA issued a 153-page final EA in November 2013 (AR 151-315), determined the proposed action would not significantly impact the environment, and issued a Finding of No Significant Impact (FONSI).  (AR 316-19.)

The Paradise EA "tiers" from Environmental Impact Statements (EISs) that TVA issued for its 1995 and 2011 Integrated Resource Plans (IRPs).[4]  An IRP is a comprehensive utility planning process that evaluates the merits of using different kinds of energy resources to meet forecasted future demand for electricity reliably and cost-effectively.  (*See* AR 381.)  Both IRP EIS processes provided the public with multiple opportunities for comment.  (*See* AR 390-93; 1715-32.)

TVA's IRPs implement § 113 of the Energy Policy Act of 1992.  *See* Pub. L. No. 102-486, § 113, 106 Stat. 2776, 2798 (1992) (codified at 16 U.S.C. § 831m-1). The Energy Policy Act requires TVA to employ a least-cost planning process "which evaluates the full range of existing and incremental resources (including new power supplies, energy conservation and efficiency, and renewable energy resources) in order to provide adequate and reliable service to electric customers of the Tennessee Valley Authority at the lowest system cost."  16 U.S.C. § 831m-1(b)(1).  TVA is directed to take into account various features of system operation, including energy resource diversity, reliability, and other factors of risk to determine the "system cost" of energy resources.  *Id*. § 831m-1(b)(2).  System cost is more than the cost of generating a kilowatt-hour of electricity; it includes all

---

**4**      "Tiering" allows an agency to go from a broader NEPA review to a site-specific one without readdressing issues or repeating information and analyses in the broader review.  40 C.F.R. § 1508.28.  NEPA regulations encourage tiering to eliminate duplication and reduce paperwork.  *Id*. §§ 1500.4(i), 1502.20.

costs of the energy resource over its life, including production costs, waste management, and environmental compliance. *Id*. § 831m-1(b)(3). TVA's 2011 IRP and related EIS was such a least-cost, system-wide programmatic analysis.[5] Specific energy resource decisions, such as the Paradise decision, are further analyzed in site-specific NEPA analyses, which tier from the programmatic IRP EISs. (AR 2355.)

The Paradise EA evaluated three alternatives in some detail: the No Action Alternative (a baseline of current conditions to which other alternatives are compared), Alternative B (installing additional air emission controls on Units 1 and 2), and Alternative C (replacing Units 1 and 2 with natural gas generation).[6] (*See* AR 187-89.) TVA also considered six other alternatives, including installing wet or dry electrostatic precipitators, burning biomass, replacing Units 1 and 2 with renewable energy generation, and energy efficiency programs. TVA

---

[5]    TVA is currently engaged in an update to its IRP. *See* Integrated Resource Plan, *available at* http://www.tva.gov/environment/reports/irp/.

[6]    Kentucky Coal misrepresents the project's scope as including "decommissioning and demolition" of Units 1 and 2. Because no rules govern the timing or manner of decommissioning or demolishing retired fossil units, they are not "connected actions" under NEPA and were not within the scope of the proposed action.

eliminated these alternatives from detailed analysis because they were not

technically or economically practical or feasible.[7]  (AR 183-86.)

TVA analyzed the potential impact of the alternatives on a number of

different environmental resources and summarized those analyses in the EA.

These included air quality (AR 192-97); climate change (AR 197-99); vegetation

(AR 199-203); wildlife (AR 203-05); threatened and endangered species (AR

205-13); aquatic ecology (AR 213-15); wetlands (AR 215-17); natural areas, parks,

and recreation (AR 217-19); groundwater and geology (AR 219-21); surface water

(AR 221-37); floodplains (AR 237-42); cultural and historic resources (AR 242-

43); hazardous waste (AR 243-45); solid waste (AR 245-47); land use and prime

farmland (AR 248-49); transportation (AR 249-54); noise (AR 254-60); and visual

resources (AR 260-62).  The EA also summarized TVA's analyses of potential

socioeconomic and environmental justice effects (AR 262-69).

TVA determined that the natural gas alternative would:

- Significantly decrease air pollutant emissions and more significantly reduce greenhouse gas emissions than other alternatives, which accelerates the fleet-wide greenhouse gas reductions forecast in TVA's 2011 IRP (AR 187, 192-99);

---

[7]    This sort of summary discussion is proper; the extent to which an agency discusses alternatives is a matter within its discretion, and alternatives that do not fulfill the project's objectives are per se unreasonable. *See, e.g.*, *Coal. for Advancement of Reg'l Transp. v. Fed. Highway Admin.*, 576 F. App'x 477, 490 (6th Cir. 2014) ("*CART*").

- Significantly reduce water withdrawals from, and thermal and wastewater discharges to, the Green River, which will improve water quality and aquatic ecology (AR 187, 219-21); and

- Reduce solid waste by decreasing the generation of coal combustion residuals. (AR 188, 245-47.)

The natural gas plant alternative included a connected action—contracting for natural gas service to supply the plant through a newly constructed gas pipeline. (*See* AR 180-82.) This gas service will be provided by a private entity, Texas Gas Transmission, LLC (Texas Gas), which is responsible for engineering, routing, and applying for a Certificate of Public Necessity for the gas pipeline. The Federal Energy Regulatory Commission (FERC) is the agency responsible for issuing the certificate to Texas Gas for the construction and operation of the gas pipeline. (AR 179.) FERC will conduct a NEPA review of the pipeline based on information and analyses submitted by Texas Gas. Because that engineering and routing information was not available in August 2013, TVA conducted an assessment of the pipeline's potential environmental effects using two alternative proposed pipeline corridors. TVA also committed to participate in FERC's NEPA review. 40 C.F.R. §§ 1501.6, 1506.3.

Following its NEPA review, TVA identified the natural gas alternative as its preferred alternative in the final EA.[8]  (AR 189-90.)  Compared to the alternative of installing additional air pollution controls on Units 1 and 2, TVA determined that replacing their generation with natural gas generation would have substantially less environmental impact.  TVA acknowledged that while the initial capital cost of installing controls would be less than the cost of a new gas plant, the environmental compliance costs for the coal units would be greater than for the gas plant over time such that the overall costs of gas would be less.  (AR 189-90.)  TVA concluded that replacing the two coal units with natural gas would promote a more balanced and diversified portfolio of energy resources on the TVA system, thereby fulfilling the 2011 IRP's goals.  (AR 190.)  Accordingly, TVA determined that this proposed action would not significantly impact the quality of the human environment and issued a FONSI in accordance with Council on Environmental Quality's (CEQ) regulations and TVA's procedures.  (AR 316.)

In response to the EA's findings, the TVA Board cancelled the conditionally-approved budget for the emissions controls and approved construction of the gas plant.  (AR 332-35.)  The Board's decision was prompted

---

[8]    Because the draft EA did not contain a preferred alternative and the Board's 2012 budget approval was contingent upon further environmental review, Kentucky Coal's accusation that "[i]n the Draft EA, for the first time, TVA indicated it preferred to abandon its prior commitment [for Alternative B]" (Doc. 20 at 21) is baseless.

by TVA staff's "least cost planning" analyses that showed the construction of the gas plant would better meet system reliability, stability, and diversity, and based on the EA's assessment that the project would have net environmental benefits.  (AR 332-33; 341-62.)

## Procedural Background

In July 2014, seven months after TVA published the Paradise EA, Kentucky Coal filed suit in the Western District of Kentucky alleging that TVA's decision did not comply with NEPA or the Energy Policy Act.  (RE 1, PageID # 1-40.) Over a month later, Kentucky Coal moved for a preliminary injunction.  (RE 17, PageID # 67-68.)  TVA filed the AR of its decision, its opposition to Kentucky Coal's motion for an injunction, and a motion for judgment on the AR in September 2014.  (RE 31-33, PageID # 269-357.)  Kentucky Coal filed a cross-motion for judgment.  (RE 46, PageID # 405-09.)  After oral argument, the district court denied Kentucky Coal's injunction request (RE 51, PageID # 508-32), and thereafter issued judgment for TVA (RE 55, PageID # 580-608).[9]  Subsequently, the district court denied Kentucky Coal's motion for an injunction pending appeal before this Court.  (RE 61, PageID # 648-54.)

---

[9]    The district court's amended opinion corrected the omission of a "not" before "arbitrary and capricious" in its original opinion (RE 52, PageID # 561); no substantive changes were made to the original opinion.

## STANDARD OF REVIEW

This Court reviews the district court's grant of judgment on the AR de novo, but applies the Administrative Procedure Act's (APA) deferential arbitrary and capricious standard of review to the challenged decision.**10**   *Latin Americans for Soc. & Econ. Dev. v. Fed. Highway Admin.*, 756 F.3d 447, 462 (6th Cir. 2014). Judicial review of an agency's NEPA action is confined to the administrative record that was before the agency at the time of the action.  5 U.S.C. § 706; *Camp v. Pitts*, 411 U.S. 138, 142 (1973) (per curiam).  An agency's NEPA decision is unlawful only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); *Save Our Cumberland Mountains v. Kempthorne*, 453 F.3d 334, 339 (6th Cir. 2006).

"The arbitrary and capricious standard is the least demanding review of an administrative action, and requires the party challenging the agency's action to show that the action had no rational basis or that it involved a clear and prejudicial violation of applicable statutes or regulations."  *CART*, 576 F. App'x at 485-86 (internal quotation marks omitted).  Under this standard, a court may not substitute its judgment for that of the agency.  *Kleppe v. Sierra Club,* 427 U.S. 390, 410 n.21

---

**10**     Kentucky Coal incorrectly describes the district court's ruling as one for summary judgment.  (Doc. 20 at 29.)  Rule 56 standards are inapplicable in APA cases because there are no facts for the court to weigh.  *See City of Cleveland v. Ohio*, 508 F.3d 827, 838 (6th Cir. 2007); *Kentuckians for the Commonwealth v. U.S. Army Corps of Eng'rs*, 963 F. Supp. 2d 670, 678 (W.D. Ky. 2013).

(1976). "A presumption of validity attaches to the agency action and the burden of proof rests with the [party] who challenge[s] such action." *Citizens' Comm. to Save Our Canyons v. Krueger*, 513 F.3d 1169, 1176 (10th Cir. 2008) (internal quotation marks omitted). "'[E]ven agency action with adverse environmental effects can be NEPA-compliant so long as the agency has considered those effects and determined that competing policy values outweigh those costs.'" *Kentuckians for the Commonwealth v. U.S. Army Corps of Eng'rs*, 746 F.3d 698, 706 (6th Cir. 2014) (internal quotation marks omitted).

This Court's review of TVA's least-cost planning process, and the NEPA analyses supporting that process, is further cabined by the deference that must be shown when an agency's decision implicates its particular area of expertise. *See, e.g.*, *St. Marys Cement Inc. v. EPA*, 782 F.3d 280, 286 (6th Cir. 2015).

## SUMMARY OF THE ARGUMENT

The Court should affirm the district court's ruling that TVA's Integrated Resource planning process, which evaluates the effects of system-wide resource options on TVA's environment and its economy, satisfies the Energy Policy Act's directive to engage in least-cost planning.  More specifically, the district court correctly held that, for least-cost planning purposes, "the lowest system cost is not necessarily the 'cheapest' option" and that the 2011 IRP "did not need to specifically consider any decisions related to Paradise Units 1 and 2."  (RE 55, PageID # 606-07.)

The Court also should affirm the district court's ruling in TVA's favor on Kentucky Coal's NEPA claims.  The district court assessed TVA's 153-page EA and the supporting AR and correctly concluded that TVA took the required "hard look" at the effects of the Paradise project.  Accordingly, it upheld the "sufficiency of the [EA] as a basis for the [FONSI]."  (RE 55, PageID # 604.)  The court found that "experts with TVA have articulated that the switch to natural gas generation would reinforce reliability of the system and reduce risks of power outages" and that the EA considered the NEPA "intensity factors" to conclude that the Paradise project would not have a significant adverse effect on the human environment as Kentucky Coal alleges, but would improve regional air and water quality and reduce the generation of coal combustion waste.  (RE 55, PageID # 587-91.)

14

**ARGUMENT**

I.    **TVA's Integrated Resource Plan Satisfies the Energy Policy Act's Least-Cost Planning Directive and Supports TVA's Subsequent Site-Specific Decision at Paradise.**

A.    **The Energy Policy Act of 1992**

The Energy Policy Act of 1992 "was designed to create a 'comprehensive national energy policy that [would] gradually and steadily increase[] U.S. energy security in cost-effective and environmentally beneficial ways.'"  *Ctr. for Biological Diversity v. Abraham*, 218 F. Supp. 2d 1143, 1149 (N.D. Cal. 2002) (quoting H.R. Rep. No. 102–474(I), at 132, *reprinted in* 1992 U.S.C.C.A.N. 1954, 1955); *see also Local 3-689, Oil, Chem. & Atomic Int'l Union v. Martin Marietta Energy Sys., Inc.*, 77 F.3d 131, 133 n.2 (6th Cir. 1996) ("The Energy Policy Act of 1992 was a broad-based enactment that promoted energy conservation and efficiency, partially in response to the Persian Gulf crisis.").  Although the Energy Policy Act required certain types of utilities to *consider* whether to employ IRPs,[11]

---

[11]    *See, e.g.*, Clinton A. Vince, Sherry A. Quirk & Stuart J. Rabin, *Integrated Resource Planning: The Case for Exporting Comprehensive Energy Planning to the Developing World*, 25 Case W. Res. J. Int'l L. 371, 380 (1993) ("Section 111 [of the Energy Policy Act] requires each state public utility commission to consider whether to mandate that each electric utility subject to its jurisdiction employ IRP. In addition, utilities not subject to state regulation must also consider whether to perform IRP.").

§ 113 *required* TVA to "conduct a least-cost planning program."  Pub. L. No. 102-486, § 113, 106 Stat. 2776, 2798 (1992).[12]

The focus of TVA's § 113 least-cost planning responsibilities "is to provide energy services to customers at the lowest price over the long run" (AR 432), which involves evaluating comprehensive system cost—"net costs for an energy resource over its available life," including "the cost of production, transportation, utilization, waste management, [and] environmental compliance."  16 U.S.C. § 831m-1(b)(3).  TVA's planning and selection process for new energy resources under § 113 "evaluates the full range of existing and incremental resources (including new power supplies, energy conservation and efficiency, and renewable energy resources)," *id.* § 831m-1(b)(1), and addresses "necessary features for system operation, including diversity, reliability, dispatchability, and other factors of risk."  *Id.* § 831m-1(b)(2)(A)–(C).  Significantly, the purpose of this planning process is to provide adequate and reliable service to electric customers of the Tennessee Valley Authority at the lowest *system* cost, not the lowest cost of individual energy resources.  *See id.* § 831m-1(b)(1), (3).

---

[12]    Least-cost planning programs and IRPs are the same thing.  *See, e.g.*, James W. Moeller, *Electric Demand-Side Management Under Federal Law*, 13 Va. Envtl. L.J. 57, 81 (1993) (noting the Energy Policy Act's requirements for adopting "least-cost or integrated resource plans").

Because TVA must comply with other statutory and regulatory obligations, "TVA's integrated resource planning process . . . goes well beyond conventional least-cost planning." (AR 432.) Thus, TVA must also "evaluate[] the effects of resource options on the Tennessee Valley's environment and its economy, as well as on TVA's future prices of electric energy and future level of debt." (AR 432.)

## B.    TVA's Integrated Resource planning process properly implements the Energy Policy Act's "least cost" directive.

The district court concluded correctly that TVA's Integrated Resource planning process is an appropriate means of implementing the Energy Policy Act's least-cost directive. (RE 55, PageID # 606.)

TVA's least-cost resource planning process was initiated in February 1994 and culminated with its 1995 IRP, Energy Vision 2020. Because of TVA's "unique mission to supply electric power and encourage sustainable economic development in its service region," Energy Vision 2020 provided the TVA Board with the "flexibility to shift priorities as the marketplace evolves and changes influence the viability of power supply options." (AR 383.) In 2011, TVA issued an updated IRP after extensive public participation. This IRP was meant to "serve as a guide" in helping TVA achieve its goal of becoming "one of the nation's

leading providers of low-cost and cleaner energy by 2020." (AR 1844.) TVA is currently in the process of updating its 2011 IRP.[13]

Thus, TVA's IRP is a broad-based analysis of TVA's resources and future needs on a system-wide basis. This process is governed by what TVA interprets as the first "component" of 16 U.S.C. § 831m-1, subsections (a) through (c), which outline the factors for consideration in implementing this program. As demonstrated by these subsections' language, the least-cost planning provisions guide TVA in implementing a program that sets generalized, system-wide goals. *See* 16 U.S.C. § 831(a) (generally requiring TVA to "conduct a least-cost planning program"); *id.* § 831(b)(1) (outlining the process for least-cost planning "under subsection (a)"); *id.* § 831(b)(2) (outlining the planning and selection process referenced in subsection (b)(1)); *id.* § 831(b)(3) (defining "system cost" as used in subsection (b)(1)); *id.* § 831(c) (addressing participation by distributors during process of devising least-cost planning program "under subsection (a)"). Site-

---

[13]     This update to the 2011 IRP is occurring "earlier than planned because several of the assumptions used in its development changed. These include reduced demand for electricity and greater availability and lower cost of natural gas." *See* Integrated Resource Plan, 2015 Draft Report, § 1.2, *available at* http://www.tva.gov/environment/reports/irp/pdf/TVA-Draft-Integrated-Resource-Plan.pdf. TVA continues to be guided by the 2011 IRP pending completion of this update.

specific decisions are addressed by the second "component" of § 831m-1, subsection (d).[14]

TVA's IRP processes employ complex computer models and require a large number of technical determinations.  TVA forecasts the demand for electricity with mathematical models that link electricity sales to the price of various fuel types; economic growth; and other factors that impact demand in the residential, commercial, and industrial electricity-user sectors.  (AR 1897.)  In TVA's 2011 IRP process, different sets of future hypothetical conditions ("scenarios") were developed that addressed a range of economic, financial, regulatory, and legislative uncertainties, as well as social and technological trends.  (AR 1899.)  In order to address uncertainty, TVA developed a range of electricity demand forecasts, each of which corresponded to a different scenario bounded by "high-load" and "low-

---

[14]    Subsection (d) states:  "Before the selection and addition of a major new energy resource on the [TVA] system, [TVA] shall provide an opportunity for public review and comment . . . ."  16 U.S.C. § 831m-1(d).  This language—"a major new energy resource"—contrasts with subsection (b)(1), which uses the plural phrase "new energy resources," and clearly contemplates a different type of decision making.  TVA considers subsection (d) to be satisfied once public review and comment is provided on a discrete addition to its energy fleet, which TVA effectuates through a specific project's NEPA review.  *See* 61 Fed. Reg. 7572-02, 7573 (explaining that "TVA prepares project-specific environmental reviews for proposed energy resource decisions").  Thus, site-specific energy resource selections follow from the least-cost planning analyses in the IRP and, as the district court correctly observed (Doc. 55 at PageID # 606), do not require a separate least-cost planning analysis.

load" endpoints.  (AR 1733-52; 1897-98.)  This analytical model provided "a high

level of confidence that the true outcome [would] fall within this range" and

"ensured that TVA's resource planning took into account the variability that is the

hallmark of year-to-year peak demand and energy sales."  (AR 1737, 1768-75,

1900-01.)  The scenarios were analyzed using industry standard capacity expansion

planning and production cost models to develop cost estimates, near-term rate

impacts, risks, and environmental footprints of each scenario.  (*See* AR 1712.)

This analytical approach allowed TVA's consideration of "a wide range of supply-

side generating resources as well as energy efficiency and other demand-side

resource options" (AR 1756, 1757-62, 2059), thus "treat[ing] demand and supply

resources on a consistent and integrated basis."  16 U.S.C. § 831m-1(b)(2)(C).

In accordance with the Energy Policy Act, one of the cornerstones of TVA's

IRP was an increased focus on "energy savings achieved through energy

conservation and efficiency."  *Id.* § 831m-1(b)(2)(B).  The 2011 IRP included an

energy efficiency and demand response (EEDR) program that "reduces required

energy and capacity needs by approximately 14,000 GWh and 4,700 MW,

respectively, by 2029."  (AR 1762.)  The IRP identified challenges in assuring the

"projected durability of [EEDR] savings measured over time," 16 U.S.C. § 831m-

1(b)(2)(B), and proposed numerous strategies to address them.  (AR 1829-31,

1863-70.)

The conclusion of the 2011 IRP process was the identification of a "preferred alternative strategy" (or "Recommended Planning Direction") based on its positive performance across the range of scenarios.  (AR 1833-40, 1908.) Although the 2011 IRP "[a]rticulate[d] a 20-year planning direction" that would "help guide TVA in making important decisions in the years to come, [it] d[id] not dictate a specific series of actions," "discard analyses done for alternative strategies," or "[s]erve as a substitute for the 'fine-tuning' of the annual planning and budgeting processes."  (AR 1845.)

"An IRP is simply a plan which broadly identifies the actions which a utility anticipates taking to meet demands for electric service and to achieve its long-term goals and objectives."  Notice, Integrated Resource Plan, Issuance of Record of Decision, 61 Fed. Reg. 7572-02, 7573 (Feb. 28, 1996); *accord* Inara Scott, *Teaching an Old Dog New Tricks: Adapting Public Utility Commissions to Meet Twenty-First Century Climate Challenges*, 38 Harv. Envtl. L. Rev. 371, 409 (2014).  Obviously, a system-wide planning process of this kind cannot encompass every individual decision TVA may implement in furtherance of the IRP's goals or objectives at some future date over the 20-year period of the IRP.  (*Accord* AR 2092 (noting, in evaluating environmental impacts of supply-side resource options for 2011 IRP, that "[b]ecause the locations of most of the future generating facilities are not known, this impact assessment focuses on impact areas that are

21

generally not location-specific").)  Thus, Kentucky Coal's complaints that the 2011

IRP "never contemplated the retirement of Paradise Units 1 and 2" ignore that

identifying site-specific energy resources (or the retirement of them) is inherently

not part of a system-wide planning process.  These complaints do not call into

question the adequacy of TVA's least-cost planning process under § 113's broad

directives.

### C.   Kentucky Coal's criticisms of TVA's least-cost planning activities ignore the comprehensive nature of the Energy Policy Act's planning directives.

Kentucky Coal argues that TVA's least-cost planning should have focused

solely on the comparative costs of generating a watt-hour of electricity.  (Doc. 20

at 31.)  In support of its argument, Kentucky Coal proffers inapt comparisons,

skewed data, and "expert reports" that are not properly considered here.[15]

---

[15]     Throughout this litigation, Kentucky Coal has relied upon reports that were created after the issuance of TVA's EA, or are comprised of materials that were not submitted during the public comment period on the draft EA.  These reports are not properly before this Court.  *See Sierra Club v. Slater*, 120 F.3d 623, 638 (6th Cir. 1997) (holding the AR consists of all materials compiled by the agency that were before the agency when it made its decision); *see also Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764-65 (2004) (holding public advocacy group forfeited right to raise claim in litigation because it failed to raise the issue in the public comment period).  TVA raised this issue below, but the district court found it unnecessary to rule on it "because the additional claims raised do not render TVA's decision arbitrary and capricious."  (RE 55, PageID # 585.)  Although it is TVA's continued position that Kentucky Coal's extra-record documents and reports are not properly considered by this Court, TVA will nonetheless address, as it did below, why these reports do not undermine TVA's decision.

Moreover, this type of comparison does not appropriately apply the Energy Policy Act's requirement to consider energy resource diversity and other factors of risk in least-cost energy resource planning processes.

Kentucky Coal asserts that "Paradise Units 1 and 2 already comply with existing emissions regulations" such that adding controls for MATS compliance is inexpensive when compared to a new natural gas plant.[16] (Doc. 20 at 31.) This simplistic comparison ignores several facts that TVA had to consider in order to compare true cost and ensure environmentally compliant *and* reliable electricity generation. First, the age of the units and their emission controls would have necessitated significant repair and replacement costs over the long run to ensure reliable performance within regulatory limits. Second, raw material costs for operation of these units is not limited to coal, but also reagents, such as limestone and ammonia, that must be purchased for pollution control processes. Finally, EPA's proposed regulation of carbon dioxide emissions, wastewater discharges, and coal ash handling for coal plants[17] will significantly increase the costs of

---

[16]    Kentucky Coal's argument is legally incorrect and its math is erroneous. Emission controls cost approximately $692 million and the gas plant approximately $1.1 billion (AR 345); thus a new gas plant is not "twice the cost" of installing controls on aging coals units nor is $692 million "comparatively inexpensive." (Doc. 20 at 30-31.)

[17]    EPA issued its final 200-page rule regulating coal combustion residuals on April 17, 2015. 80 Fed. Reg. 21302.

continued reliance on coal as an energy resource.  The new gas plant implicates

none of these additional costs.  Failure to consider these factors in the calculus

would have been inconsistent with the directives of § 113.  Thus, TVA's decision

to replace Units 1 and 2 with a gas plant not only results in the least cost for the

TVA system, but also in the least cost among the options available for generation

at Paradise over time.

Kentucky Coal's argument that Paradise Units 1 and 2 are among the most

economical in TVA's fleet also fails to recognize that a unit's economy is directly

related to how it is operated.  Paradise Units 1 and 2 are most efficient when

generating at capacity, but are not able to easily adapt to energy-use fluctuations.

Demand for TVA power, however, can fluctuate greatly.  As an example, the

difference between daytime and nighttime energy use can easily "swing" between

13,000 and 26,000 megawatts in a particular area.  (*See* AR 1746 (illustrating

energy-use peaks that can occur throughout the day and the types of energy

resources that best respond); *see also* AR 1945.)  TVA needs plants that can

respond to these fluctuations, and gas generation is particularly suited to meet

"swing" energy needs because it can easily provide more or less power as needed.

(*See, e.g.*, AR 1747.)  Accordingly, using gas at Paradise is more "economical" for

TVA's needs and was the appropriate least-cost option.  (*See* AR 342, 345.)

Kentucky Coal is also incorrect that the decision to switch from coal to gas at Paradise Units 1 and 2 will "heavily slant TVA towards reliance on natural gas over coal." (Doc. 20 at 33.) Indeed, the Integrated Resource planning that TVA began in response to the Energy Policy Act has led TVA to correct an over-reliance on coal and to better balance its portfolio across diverse energy resources, including coal, nuclear, hydro, gas, and renewables. This balance allows TVA to more effectively hedge the risk presented by over-reliance on any one fuel or generation technology. (*See, e.g.*, AR 417, 609 (outlining TVA's previous preferred portfolio of resource options); AR 1750 (noting that use of a variety of energy resources is "designed to provide reliable, low-cost power, while minimizing the risk of disproportionate reliance on any one type of resource").)

Finally, Kentucky Coal argues, in purely speculative fashion and in reliance on extra-record reports, that increasing demand for natural gas "could" overwhelm supply, result in significant price volatility, and endanger gas supply at Paradise. (Doc. 20 at 32-33.) But TVA did consider potential increased demand for natural gas and its effect on this resource's price volatility and simply came to a different conclusion than Kentucky Coal. (*See generally* AR 8111; *see also* AR 341-62, 1737, 1739, 1768, 1769-71, 1776, 2123, 2124, 2247-50.)

Ultimately, Kentucky Coal's contentions boil down to their disagreement with TVA's conclusions on these points. In other words, from a technical and

scientific standpoint, Kentucky Coal argues that it is right and that TVA is wrong.

This Court recently rejected such an argument in a case in which a cement factory,

St. Marys, challenged the bases for the EPA's decision to require the plant to

install more stringent emissions controls:

> When all is said and done, St. Marys' key complaint, it seems to us, targets the EPA's technical and scientific views. . . .  Maybe time will prove St. Marys right on some of these fronts; maybe not. But arbitrary and capricious review does not ask who is right.  It asks whether the EPA followed a defensible process in assessing who is right.  As to that, it cannot be said that the EPA "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  On top of that, we are at our "most deferential" when "reviewing an agency's scientific determinations" about issues within its expertise, which assuredly includes an inquiry into how to reduce nitrous oxide emissions by fifty percent at a cement plant.  We uphold the EPA's judgment that this new technology will work effectively at the Charlevoix plant.

*St. Marys Cement Inc.*, 782 F.3d at 286 (citations omitted).

This rationale applies here.  TVA's least-cost planning decisions, and their

implementation at Paradise, are not arbitrary or capricious.  They are the product of

TVA's expertise in deciding the best way to provide reliable and affordable

electricity to the residents of the Tennessee Valley region in a way that complies

with the statutory directives applicable to TVA as a federal agency *and* producer of

electric power.  The district court correctly rejected Kentucky Coal's arguments to

the contrary.

**D.    The site-specific decision to retire Paradise Units 1 and 2 is supported by the broad goals of the 2011 IRP.**

As required by the Energy Policy Act, TVA employed the results of its 2011 IRP in the decision-making process leading to the site-specific NEPA analysis of the replacement of the Paradise coal units with natural gas:

> TVA's 2011 IRP and associated EIS evaluated a wide range of strategies and actions for meeting demand for electricity from the TVA system in the future.  TVA adopted a planning direction to achieve a more balanced, diverse portfolio of energy resources on the TVA system.  This includes relying more on energy resources that are cleaner than coal generation:  nuclear and natural gas generation, renewable energy and energy efficiency.  Alternative C [the natural gas alternative] advances this planning goal of achieving a more balanced and diversified portfolio.  The selection of [Alternative C] as the preferred alternative is also influenced by TVA's recent decision to install controls at its Gallatin Plant.  Having preserved coal-fired generation capacity at Gallatin, TVA now has greater latitude to shift from coal to gas at [Paradise] in the interest of maintaining a diverse portfolio.

(AR 190.)

Kentucky Coal's argument that the 2011 IRP does not support the decision to retire Paradise Units 1 and 2 because TVA was "bound" to the preferred level of idled coal-fired capacity identified in the IRP's Recommended Planning Direction is premised on an incorrect understanding of the IRP process and how it implements the Energy Policy Act's least-cost planning directive.

The TVA Board approved an IRP with substantial flexibility.  This is most easily demonstrated by the nature of the IRP itself, which outlines broad goals and

a generalized direction for meeting the energy needs of the Tennessee Valley region over a 20-year period, but provides TVA the ability to adapt its implementation of the plan to the conditions presented in the years following the IRP's completion.  Kentucky Coal's argument that the Board only retained flexibility to "operate within the guideline ranges provided for by the [IRP's Recommended Planning Direction]" (Doc. 20 at 40) is contradicted by the plain language of the IRP.

The IRP states that although it "will help guide TVA in making important decisions in the years to come, [it] does not dictate a specific series of actions." (AR 1845.)  It clarifies that the IRP *does* "[a]rticulate a 20-year planning direction," but *does not* "[f]inalize specific asset decisions" or "[s]erve as a substitute for the 'fine-tuning' of the annual planning and budgeting processes." (AR 1845.)  The IRP *does* "[p]resent recommended strategy alternatives," but *does not* "discard analyses done for alternative strategies."  (*Id*.)  The IRP *does* "[d]escribe guideline ranges for key components of the Recommended Planning Direction (i.e., EEDR, idling of coal-fired units, etc.)," but *does not* "[m]ake specific commitments for key components of the Recommended Planning Direction."  (*Id.*)

As an additional illustration of the flexibility inherent in the IRP, the TVA Board's resolution approving the IRP specifically states that "th[e] IRP provides

TVA [a] planning direction and the flexibility to make sound choices in a dynamic, ever-changing regulatory and economic environment by providing guideline ranges for the primary components of the IRP."[18]  The IRP and the megawatt reduction of coal-fired generation in it is a guide, *not* a boundary.

Perhaps more importantly, the Planning Direction specifically directed TVA staff to "[c]onsider increasing [the] amount of coal-fired capacity [to be] idled" and to "[u]tilize natural gas as an intermediate supply source."  (AR 1692; *see also* AR 2354 (listing the recommended idled coal-fired capacity between 2,400 and 4,700 MW "with consideration for increasing the amount of coal capacity idled" and recommending natural gas additions between 900 and 9,300 MW).)  Subsequent decisions to exceed the specific upper range identified in the IRP are fully consistent with these qualitative directions to staff and appropriately implement TVA's least-cost planning program.

The 2011 IRP's Issuance of Record Decision also noted, in comparing the environmental impacts of Strategy E—which had the lowest overall environmental impacts—and the Recommended Planning Direction—which had the second lowest impacts—that the differences in impacts between these two strategies "would be reduced if the amount of coal generating capacity that is idled as

---

[18]    Minutes of TVA Bd. Meeting at 6, Apr. 14, 2011, *available at* http://www.tva.gov/abouttva/board/pdf/4-14-2011_minutes_chattanooga_tn.pdf.

Strategy R is implemented approaches *or exceeds the upper end of the 2,400 to 4,700 MW range*." (AR 2354 (emphasis added).) This provides further evidence that the adoption of a Recommended Planning Direction in the 2011 IRP was not meant to strictly bind TVA to the particular ranges suggested within it.

The retirement of up to 7,000 megawatts of coal-fired generation was considered and evaluated in the 2011 IRP process. (*See* AR 1774 (describing various strategies, including Strategy D, which considers "7,000 MW total fleet reductions [of coal-fired capacity] by 2017"); AR 1812 (describing characteristics of "sensitivity cases," including Strategy E1, which assumes 7,000 MW of coal-fired idling); AR 2354 (noting that Strategy D includes the largest amount of idled coal capacity (7,000 MWs).) Because the IRP provides that the Recommended Planning Direction *does not* "discard analyses done for alternative strategies" (AR 1845), Kentucky Coal's discussion of the "elimination" of the various strategies that the IRP considered and its argument that idling more coal capacity than the upper end of the 2,400-4,700 MW range does not further the Recommend Planning Direction (Doc. 20 at 37-38) misconstrue the flexible nature of an IRP. TVA's IRP states that it "[p]resent[s] recommended planning strategy alternatives," but does not make any of those strategies a straight-jacket that binds TVA in achieving the over-arching goals of the plan through other plans that rely on "analyses done for alternative strategies." (AR 1845.)

30

Kentucky Coal faults the Paradise AR for not including detailed optimization analyses supporting TVA's Paradise action in furtherance of the IRP's recommendations to both increase the amount of idled coal-fired capacity and to add natural gas as an intermediate supply source. (Doc. 20 at 39-40.) These analyses are summarized in the discussion of "Preferred Alternative" in the Paradise EA (AR 189) and are supported by the "Paradise 1-2 Evaluation Summary Technology Selection" in the AR (AR 341). This document is from a presentation given to the Finance Rates and Portfolio Committee of the TVA Board in October 2013 and describes the significant drivers behind the re-evaluation of the decision whether to install air emission controls on Units 1 and 2 or replace them with natural gas. (AR 342.) It contains the major assumptions driving the recommendation, including energy sales and demand forecasts, evolution of gas prices, environmental compliance deadlines, project timelines, as well as capacity factors, system costs, and capital and fixed cost comparison of the options under consideration. (AR 342-46; 349-51; 354-55; 360-62.) It analyzes each option within the same "sensitivities" and "high/low" bounding parameters as the IRP process. (AR 345, 350.) It lists each coal unit in the TVA system scheduled to be idled with the "driver for [the] idle decision." (AR 357.)

Consideration of TVA's IRP process and its application to the decision at Paradise demonstrates that TVA did not "entirely fail[] to consider an important

aspect of the problem, offer[] an explanation for its decision that runs counter to the evidence," or render a decision "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *St. Marys Cement*, 782 F.3d at 286 (internal quotation marks and citation omitted). Based on TVA's expertise in the areas of energy production, consumption, and regulation; the broad nature of the applicable statutory factors; and TVA's careful consideration of them, the ultimate planning program devised is clearly within the permissible "zone of reasonableness." *In re Permian Basin Area Rate Cases*, 390 U.S. 747, 767 (1968) (internal quotation marks omitted). The district court correctly rejected Kentucky Coal's allegation that TVA violated the Energy Policy Act.

## II.    TVA's Site-Specific NEPA Review of the Paradise Project Properly Tiered from the IRP and Complied with NEPA.

### A.    Statutory framework

NEPA sets forth broad environmental goals, but "its mandate . . . is essentially procedural." *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978); *accord Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).

Agencies' internal NEPA procedures and CEQ regulations, 40 C.F.R. §§ 1500.1 to 1508.28, identify the levels of environmental review for a proposed action. TVA adopted its NEPA procedures with CEQ's approval after publication and public comment. (AR 363-78.)

32

EISs are the most detailed and comprehensive level of review and are required for major actions that significantly impact the quality of the human environment.  40 C.F.R. §§ 1502.1, 1508.11.  In contrast, EAs are more concise public documents that provide evidence and analysis sufficient to determine whether to issue a FONSI or prepare an EIS.  40 C.F.R. § 1508.9.  "[T]he decision not to prepare an EIS is left to the 'informed discretion' of the agency." *Providence Rd. Cmty. Ass'n v. EPA*, 683 F.2d 80, 82 (4th Cir. 1982).  The Sixth Circuit has made clear that an EIS is not required when an agency determines that a proposed action will benefit the environment and not have significant adverse impacts.  *Friends of Fiery Gizzard v. Farmers Home Admin.*, 61 F.3d 501, 505 (6th Cir. 1995).  "An agency's decision to issue a FONSI and not prepare an EIS is a factual determination which implicates agency expertise." *Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257, 1274 (10th Cir. 2004) (internal quotation marks and citation omitted).

**B.    TVA did not segment the Paradise NEPA review or "shunt" evaluations to FERC.**

Kentucky Coal argues that TVA impermissibly segmented its analysis and "shunted" evaluations of the gas pipeline to FERC.  This is false.[19]  TVA

---

[19]    Kentucky Coal's reference to "backup fuel infrastructure" (Doc. 20 at 58) is disingenuous.  From the proceedings below, it knows that even though TVA examined the impacts from the above-ground fuel oil storage tanks, it nevertheless

recognized that securing gas service for the proposed gas plant would necessitate a new pipeline and that this was a connected action. Accordingly, TVA's EA addressed the potential impacts of the pipeline using two broad alternative routes ("corridors"). (AR 168, 173, 180-82, 186, 194-95, 196, 199, 201-03, 204-05, 209, 212, 214, 217-18, 219, 221, 229-30, 236, 238, 243, 249, 261.)

TVA identified pipeline corridors based on discussions with potential gas suppliers. (AR 80-82.) That is all TVA was able to do because the pipeline was to be later engineered and routed by the chosen gas supplier. TVA acknowledged that this analysis was preliminary in nature and committed to participate in the site-specific analysis that FERC, the agency with jurisdiction over the licensing of facilities to transport natural gas in interstate commerce, 15 U.S.C. § 717f, will conduct as part of its licensing process. This was fully consistent with the directive that a federal agency should "commence[] its NEPA process at the earliest possible

---

(. . . continued)
decided that the tanks are not needed and will not be built. (AR 173, 182, 231, 236, 253; *see also* RE 32-1 PageID # 318 nn.15, 18.)

This allegation can only be supported with accusations that both federal agencies involved in the Paradise action will act in bad faith. (*See* Doc. 20 at 55, 75-76.) These allegations are specious and flout the presumption of regularity in the conduct of government. *See United States v. Chem. Found., Inc.*, 272 U.S. 1, 14-15 (1926).

time." 40 C.F.R. § 1501.2(d).[20]    Accordingly, the district court correctly

concluded that this was an appropriate approach under the circumstances.  (RE 55,

PageID # 594-96.)

FERC's licensing process is now underway.  Texas Gas filed an application

with FERC for a Certificate of Public Convenience and Necessity on March 4,

2015, and Kentucky Coal is an intervenor in that proceeding.  *In re Texas Gas*

*Transmission, LLC*, CP15-105-000 (FERC Mar. 4, 2015).  By virtue of

amendments made to the Natural Gas Act by the Energy Policy Act of 2005, FERC

"shall act as the lead agency for the purposes of coordinating all applicable Federal

authorizations and for the purpose of complying with [NEPA]."  15 U.S.C. § 717n;

*see also* Guidance for Federal and State Agencies for the Processing of Federal

Authorizations in Cooperation with the FERC, *available at*

http://www.ferc.gov/industries/gas/enviro/epact-gas-guidance.pdf  (FERC is

required "to coordinate the environmental review and the processing of all federal

authorizations relating to proposals for natural gas infrastructure under [its]

jurisdiction . . . .").

---

[20]    If TVA had waited for FERC to finish its licensing process to begin its
analysis of potential environmental impacts as Kentucky Coal suggests (Doc. 20 at
72), the MATS compliance deadline would have passed and Alternative C would
have been eliminated without any analysis since it would no longer have met the
purpose and need of the project.  Such behavior would have run counter to CEQ's
regulations.

As lead agency for the NEPA review of the pipeline, FERC will determine

which level of review is appropriate.  In the past, FERC has done EISs and EAs for

similar projects.  FERC's NEPA reviews are not only comprehensive but include

mitigation measures to ensure that projects under consideration will not have a

significant impact on the environment.  *See, e.g.*, *Minisink Compressor Project*

*Environmental Assessment*, Section D: Conclusions and Recommendations, Dkt.

No. CP11-515-000 (FERC Office of Energy Projects Mar. 2012), *available at*

http://www.ferc.gov/industries/gas/enviro/eis.asp; *Ruby Pipeline Project*

*Environmental Impact Statement* § 5.2, Dkt. No. CP09-54-000 (FERC Office of

Energy Projects Jan. 8, 2010), *available at*

http://www.ferc.gov/industries/gas/enviro/eis/2010/01-08-10.asp.  These reviews

are guided by numerous environmental guidelines and best management practices,

including ones for erosion control, wetlands mitigation, and historic properties

preservation.[21]

---

[21]    *See Upland Erosion Control, Revegetation, and Maintenance Plan* (FERC
Office of Energy Projects May 2013), *available at*
http://www.ferc.gov/industries/gas/enviro/plan.pdf; *Wetland and Waterbody
Construction and Mitigation Procedures* (FERC Office of Energy Projects May
2013), *available at* http://www.ferc.gov/industries/gas/enviro/procedures.pdf;
*Guidelines for Reporting on Cultural Resources Investigations for Pipeline
Projects*, (FERC Office of Energy Projects May 2002), *available at*
http://www.ferc.gov/industries/gas/enviro/culresor.pdf.

The analysis performed by TVA is entirely appropriate where the exact contours of a proposed project are not yet defined. NEPA does not require agencies to "do the impractical" by analyzing the environmental impacts of project details that are still amorphous. *See CART*, 576 F. App'x at 492; *Envtl. Prot. Information Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1014 (9th Cir. 2006). Rather, an agency may properly study the general information available at the time of its NEPA review and later supplement when project specifics are known. *See, e.g.*, *Karst Envtl. Educ. & Prot. v. Fed. Highway Admin.*, No. 1:10-CV-154-R, 2011 WL 5301589, at *26 (W.D. Ky. Nov. 2, 2011) (affirming FHWA's analysis of Transpark project despite failure to evaluate potential air emissions from the second phase of the project because "it was unclear how the land will be zoned if and when purchased, what type of industry will be attracted to the space when it is made available, and the types of emissions those industries will produce when they are in place").

Here, TVA reviewed the entire project—the gas plant and the pipeline—when it conducted its NEPA review and will consult as a cooperating agency on FERC's NEPA review of the pipeline. This approach fulfills CEQ's regulations pertaining to agency cooperation (40 C.F.R. §§ 1501.6, 1508.27(b)) and the goals of efficiency and avoidance of duplication (*id*. § 1506.4). In addition, throughout the EA, TVA discussed mitigation measures which would avoid potential adverse

effects associated with the pipeline.  (AR 190, 197, 199, 203, 205, 212-13, 215, 217, 219, 221, 226, 236, 238, 243, 245, 247, 249, 254, 260, 262, 269.)  An agency need not issue an EIS if it determines that significant adverse effects can by avoided through mitigation.  *See Sierra Club v. Slater*, 120 F.3d at 635.

Thus, in doing its analysis of potential pipeline impacts, TVA did not separate pieces of the project to *avoid* NEPA review, which is the hallmark of impermissible segmentation, *see Hirt v. Richardson*, 127 F. Supp. 2d. 833, 842 (W.D. Mich. 1999), but conducted a first-level NEPA review that will be further refined by FERC.  This approach is logical and appropriate.

### C.    TVA analyzed effects on various resources along the proposed pipeline routes.

TVA specifically addressed the potential effects to wetlands, threatened or endangered species, vegetation/wildlife, historic/cultural properties, and floodplains within the two proposed pipeline corridors.[22]

---

[22]    Kentucky Coal's arguments concerning vegetation and wildlife are limited to pipeline effects, and, as discussed above, it is proper for an agency to study the general information available at the time of its NEPA review with later supplementation when project specifics are known.  Evaluation of impacts on wildlife and vegetation is found throughout the EA.  (*See* AR 199-205.) Finally, Kentucky Coal's allegation that the AR contains no documentation of consultation with the Fish and Wildlife Service is wrong.  (*See* AR 10188.)

1.    **Floodplains and wetlands**

Kentucky Coal's claims that TVA's assessment of impacts to floodplains

and wetlands was insufficient (Doc. 20 at 59-61, 67-68) are incorrect.  TVA's

NEPA procedures incorporate Executive Order 11988 (AR 375) and define what is

"practicable" for the "no practicable alternative" analysis required by the executive

order.  (AR 365.)[23]  The EA reiterates that TVA, a federal agency, "is subject to

the requirements of EO 11988."  (AR 237.)  In 1979, TVA issued guidelines for

implementing EO 11988 (Floodplains) and 11990 (Wetlands).  *See* Implementation

of Executive Order Nos. 11988 & 11990, Floodplain Management & Protection of

Wetlands; Procedures & Draft Implementing Guidelines, 44 Fed. Reg. 45513

(Aug. 2, 1979).  That guidance provides "[w]hen a class of routine or recurring

actions exists and the consideration of whether to locate in a floodplain or wetland

are substantially similar . . . a floodplain or wetland evaluation of the class may be

undertaken."  *Id*. at 45516.  TVA undertook such a class evaluation in 1981 on

certain repetitive actions including "[u]nderground, overhead, or anchored utility

---

[23]    TVA NEPA Procedure 4.3 recites that "practicable" for the Executive
Orders on Floodplains and Wetlands "refers to the capability of an action being
done within existing constraints."  (AR 365.)  "The test of what is practicable
depends on the situation involved and should include an evaluation of all pertinent
factors, such as environmental impact, economic costs, technological achievability,
and public benefit."  (AR 365.)  All of these factors were evaluated in the EA for
both alternatives.

and related lines and support structures," "[o]utfalls" and "[w]ater intake

structures" that occur "adjacent to streams or TVA reservoirs." Class Review of

Repetitive Actions in 100-Year Floodplain, 46 Fed. Reg. 22845, 22846 (Apr. 21,

1981).[24] TVA determined that there is normally no practicable alternative to siting

in the floodplain for these actions and that the adverse impact of such actions could

be minimized through routine criteria that are listed in the Federal Register notice.

*Id*. TVA's finding that there would be no significant impact to floodplains from

the outfall and water intake structures at Paradise or the underground gas lines in

the pipeline corridors was covered by TVA's class evaluation.

As for wetlands, coordination with the Corps is generally necessary when a

§ 404 permit under the Clean Water Act (CWA) is sought for a concrete proposal

that results in impacts to jurisdictional wetlands due to the discharge of dredge or

fill. No such coordination is necessary at the early stage of a proposed action when

the agency is conducting its NEPA review, as it can rely on its own experts for

these assessments.[25] TVA's wetland expert consulted U.S. Fish and Wildlife

---

[24]    The term "repetitive action" was coined by the Federal Emergency
Management Agency in their "Further Advice on Executive Order 11988,"
*available at* http://www.gsa.gov/graphics/pbs/Advice_EO11988.pdf.

[25]    Of course, Texas Gas will consult with the Corps when it seeks a §
404 permit for the final pipeline route, and TVA has done likewise for its activities at
the Paradise reservation that require § 404 authorization. (AR 303.)

Service National Wetland Inventory maps, aerial photographs, and land use/land cover data to determine that the only wetlands on the Paradise site are classified as L1UBHx (Lacustrine, Limnetic, Unconsolidated Bottom, Permanently Flooded, Excavated). These wetlands are considered non-jurisdictional by the Corps because they are not hydrologically connected to a navigable water and thus fall outside the definition of "waters of the United States" in § 404 of the CWA. (AR 215-17; *see also* AR 5596-5738.) The EA therefore concluded that "[n]o jurisdictional wetlands are known to occur within the project footprint at [Paradise]" such that "there would be no direct impacts to jurisdictional wetlands from the construction of the [gas] plant." (AR 216.) In addition, "[w]ith the possible exception of the water intake and discharge structure, forested wetlands bordering the Green River would be avoided during plant and transmission line construction,"[26] and any indirect impacts to nearby wetlands would be mitigated through Kentucky's Best Management Practices, which are included in Paradise's National Pollution Discharge Elimination System permit. (*Id*.; AR 5553-55.)

Kentucky Coal argues that TVA did not assess impacts to wetlands in the specific pipeline route yet to be identified at the time the EA was issued. TVA's

---

[26]    Geotechnical studies were undertaken by TVA at the proposed location of the intake structure in anticipation of its submission of a report to the Corps for § 404 authorization. These studies demonstrated there were no wetlands present.

EA assessed the two potential pipeline corridors (AR 217) and concluded that any

impacts to wetlands that might occur in the final pipeline corridor could be

mitigated in accordance with TVA's Best Management Practices (AR 8889-93), as

well as FERC's mitigation procedures. *Wetland and Waterbody Construction and*

*Mitigation Procedures* (FERC Office of Energy Projects May 2013), *available at*

http://www.ferc.gov/industries/gas/enviro/procedures.pdf. To the extent

permanent impacts to wetlands in the pipeline route could not be avoided,

appropriate "mitigation banking"[27] under § 404 of the CWA would be

implemented. (AR 217.)

Kentucky Coal argues that TVA failed to state explicitly in the EA that

installing emission controls was not a practicable alternative to installing gas-fired

units. (Doc. 20 at 31-32.) The factors that are the foundation for a no-practicable-

alternative determination (e.g., environmental impacts, economic costs,

technological achievability, and public benefit) are addressed throughout the EA

and are summarized in the "Alternatives" chapter of the EA. (*See, e.g.*,

AR 187-90.) The assessment that Alternative B was not a "practicable alternative"

---

[27] "Mitigation banking" is "wetland restoration, creation, enhancement, and in exceptional circumstances, preservation undertaken expressly for the purpose of compensating for unavoidable wetland losses in advance of development actions, when such compensation cannot be achieved at the development site or would not be as environmentally beneficial." *See* Federal Guidance for the Establishment, Use and Operation of Mitigation Banks, 60 Fed. Reg. 58605, 58606 (Nov. 28, 1995).

is necessarily embodied in TVA's discussion of its Preferred Alternative, which lists the important considerations leading to the choice of Alternative C combined with the findings that there would be no direct impacts to jurisdictional wetlands from the construction of the gas plant. The selection of Alternative C as the preferred alternative was based on factors prescribed in the definition of "practicable" in TVA's NEPA Procedures. (AR 365.)

### 2.    Threatened/endangered species

Regarding TVA's analysis of impacts to threatened/endangered species, Kentucky Coal argues: (1) "there is no evidence of further consultation with USFWS (or FERC) relating to Section 7 consultation . . . for the gas pipeline"; (2) TVA did not take the required "hard look" at potential impacts to species from the gas pipeline; and (3) the EA does not explain how mitigation measures, such as clearing outside the Indiana bat nesting season or contributing to the Indiana Bat Conservation Fund, "will [ensure] that impacts will not be significant." (Doc. 20 at 62-63.)[28]

Further consultation with the U.S. Fish and Wildlife Service (USFWS) takes place after Texas Gas submits its application for a Certificate of Public Necessity to

---

[28]    TVA determined that neither alternative would impact any species listed under the Endangered Species Act. This determination was coordinated with U.S. Fish and Wildlife Service, who concurred with TVA's determination. (AR 297-98; AR 10188-90.)

FERC.  In light of this fact, TVA took a "hard look" in the EA at potential impacts
to threatened and endangered species resulting from pipeline construction in the two
proposed corridors.  (AR 212-13.)  Moreover, USFWS's practice of ensuring that no
adverse impacts will occur to listed species through certain mitigation measures,
such as seasonal limitations on clearing and payment into the Indiana Bat
Conservation Fund, is well-established in Kentucky.  *See generally Working with
Indiana Bats in Kentucky*, USFWS, Ky. Ecological Services Field Station, *available
at* http://www.fws.gov/frankfort/indiana_bat_procedures.html; Revised Indiana Bat
Mitigation Guidance for the Commonwealth of Kentucky, *available at*
http://www.fws.gov/frankfort/pdf/Jan2011%20Indiana%20bat%20Mitigation%20Gu
idance.pdf; Final Revised Biological Opinion: The Service's Continued Participation
In and Approval of Conservation Memoranda of Agreement for the Indiana Bat
(*Myotis sodalist*), USFWS, Ky. Field Office (Jan. 3, 2011), *available at*
http://www.fws.gov/frankfort/pdf/Final%20Revised%20BO%20MOA%20for%20I-
Bat.PDF

### 3.    Historic/cultural properties

For its analysis of possible cultural resources along the potential gas pipeline
routes, TVA compiled existing data from the Office of State Archaeology in
Lexington, the Historic Structure Inventory in Frankfort, and the National Park
Service's online resources of historic places and landmarks.  For those areas not

addressed in existing databases, TVA employed modeling to estimate the

probability that intact prehistoric archaeological sites were present.  (AR 241-42.)

In accordance with § 106 of the National Historic Preservation Act,

(NHPA), TVA consulted with the Kentucky State Historic Preservation Officer

(SHPO) regarding the project's potential impacts on historic properties.  On

October 11, 2013, TVA informed the SHPO that it was considering a second

alternative—a gas plant—in addition to the original emission controls alternative.

(AR 6941.)  This letter notified the SHPO that the gas plant "would be associated

with two related undertakings:  a transmission line . . . and one or more gas

pipelines to bring natural gas to the plant" and that TVA would be using a "phased

identification and evaluation process for the identification of historic properties,

evaluations of effect, and resolution of adverse effects associated with these related

undertakings."  (*Id.*)  NHPA's regulations provide for this "phased identification"

process.  36 C.F.R. § 800.4(b)(2).

The SHPO did not respond to TVA's letter within thirty days; therefore, in

accordance with applicable regulations, TVA's responsibilities under the NHPA

were fulfilled.  *See* 36 C.F.R. § 800.4(d)(1)(iv)(A).  However, on February 18,

2014, the SHPO responded to TVA (AR 6950-51), acknowledged that TVA was

following the "phased identification procedures," and noted that "TVA expects to

submit additional detailed plans and documentation" for the transmission line and

pipeline aspects of the project. (AR 6950.) The SHPO's letter requested that TVA

provide additional information concerning the "area of potential effect" and an

Indian knoll. (AR 6951.) TVA provided this information to the SHPO on March

25, 2014. (AR 6952- 6957.) The SHPO's subsequent April 29, 2014 letter

acknowledged receipt of all information concerning the assessment of impacts of

the gas project on historic properties. (AR 6958.) Thus, consistent with § 106,

TVA afforded the SHPO an opportunity to comment on the impacts of the gas

project on historic properties. The NHPA requires nothing more.

### D.    TVA did not predetermine its decision.

TVA's consideration of this project demonstrates the exact opposite of

predetermination. Initially, TVA proposed to comply with MATS by installing

emission controls on Units 1 and 2.[29] (*See* AR 324, 326, 330.) Upon further

environmental review and reassessment of coal and gas generation's merits in light

of least-system cost, TVA determined that retiring the two coal units and replacing

their generation with a natural gas plant was the better alternative. Accordingly,

the TVA Board withdrew its prior approval for the emission controls and

---

[29]    The Board's approval was conditioned on "satisfactory completion of required environmental reviews." (AR 324.) Courts have held that such a contingent project approval before completion of the NEPA review does not constitute predetermination. *See Nat'l Audubon Soc'y v. Dep't of the Navy*, 422 F.3d 174, 205 (4th Cir. 2005); *Tenn. Envtl. Council v. TVA*, 32 F. Supp. 3d 876, 886 n.3 (E.D. Tenn. 2014).

authorized the construction of the natural gas alternative.  (AR 332-35.)  As the

district court correctly found, "[Kentucky Coal has] not identified any evidence

that indicates that prior to the issuance of the EA, TVA had made an 'irreversible

and irretrievable commitment of resources' to its decision to retire Paradise Units 1

and 2 and build a new gas-fueled generation plant [thus] TVA's decision . . . was

not predetermined."  (RE 55, PageID # 602-03.)

### E.    TVA's decision to prepare an EA and FONSI was appropriate.

TVA's FONSI was predicated on a thorough EA supported by an expansive

record.[30]  The EA tiered from TVA's 2011 IRP EIS and that EIS tiered from

TVA's 1995 IRP EIS.  TVA's decision to rely on an EA instead of preparing an

EIS is entitled to deference.  *See Providence Rd. Cmty. Ass'n v. EPA,* 683 F.2d 80,

82 (4th Cir.1982).  Deference is appropriate because "'[a]n agency's decision to

---

[30]    Given the extensive opportunity for public participation in the IRP EIS and
the Paradise EA process, TVA did not believe giving the public a further
opportunity to comment on the Paradise FONSI was necessary because a FONSI is
essentially a summary of the analyses in an EA.  In an abundance of caution,
however, TVA made the Paradise FONSI available for public comment for 30 days
on July 30, 2014 (AR 321-22) and received only two comments, both of which
expressed support for TVA's decision.  (AR 10291, 10292.)  Because none of the
FONSI comments casts doubt on TVA's determinations of insignificance, TVA
confirmed its original FONSI. (AR 323.)  Thus, to the extent that there was any
procedural oversight in TVA's handling of public commentary here, it was cured.
*See, e.g.*, *Sierra Club v. Wagner*, 555 F.3d 21, 31 (1st Cir. 2009); *Friends of the
Clearwater v. Dombeck*, 222 F.3d 552, 561 (9th Cir. 2000); *Citizens Advisory
Comm. on Private Prisons v. U.S. Dep't of Justice*, 197 F. Supp. 2d 266, 270
(W.D. Pa. 2001).

issue a FONSI and not prepare an EIS is a factual determination which implicates agency expertise.'" *Greater Yellowstone Coal.*, 359 F.3d at 1274 (citation omitted). "The regulations make it clear that full-scale environmental impact statements—statements that are 'very costly and time-consuming to prepare and [have] been the kiss of death to many a federal project'—need not be prepared for every major Federal action that might conceivably have a significant effect on the quality of the human environment." *Friends of Fiery Gizzard*, 61 F.3d at 504 (citation omitted). Recently, this Court affirmed DOE's decision to prepare an EA, not an EIS, to assess the effects of constructing a *new* biorefinery plant that would harvest 1.1 million green tons of hardwood per year because "the Department took a 'hard look' at the environmental impacts the . . . plant w[ould] cause and decided that those impacts did not call for a full environmental impact study." *Klein v. U.S. Dep't of Energy*, 753 F.3d 576, 582 (6th Cir. 2014). If an EA is appropriate for a *new* biorefinery plant, so too is an EA appropriate for the substitution of gas generation for the coal units at Paradise, an *existing* industrial site.

### 1. Preparation of an EA for the Paradise project is consistent with TVA's past practice.

Kentucky Coal argues that by preparing an EA rather than an EIS for the project TVA did not act in accordance with its own NEPA procedure 5.4.1 (AR 370), which lists "major power generating facilities" as one of five enumerated actions that "normally will require an [EIS]." It argues that TVA "re-

48

wr[o]te," and "internally amend[ed]," its NEPA procedure 5.4.1 and therefore

TVA's decision not to prepare an EIS was arbitrary and capricious.**31**  The district

court correctly held that "TVA has discretion to determine whether the 'normal'

preparation of an EIS is warranted" under the specific facts of the project and

where the proposed action "would have no major environmental impacts and

would actually have important environmental benefits."  (RE 55, PageID # 586-

87.)

TVA's procedure uses the word "normally" to qualify the actions requiring

an EIS.  This was not an accidental word choice, but a purposeful one designed to

communicate that an EIS is not *always* required for major power generating

facilities and provide TVA discretion to determine, using its expertise and

judgment, that the specifics of a situation allow use of an EA rather than an EIS.

*See, e.g.*, *City of Dallas v. Hall*, 562 F.3d 712, 722 (5th Cir. 2009) ("[B]y their own

terms, the regulations 'normally' require preparation of an EIS but do not dictate

preparation in each case. . . .  [T]he regulations clearly envision that when,

pursuant to an EA, the agency determines that an action will have no major

environmental impacts, an EIS is not required[.]"); *Comm. to Preserve Boomer

Lake Park v. Dep't of Transp.*, 4 F.3d 1543, 1555 (10th Cir. 1993) ("[A]ctions

---

**31**    Kentucky Coal did not raise this issue below; thus, it waived the argument. *See, e.g.*, *Sigmon Fuel Co. v. TVA*, 754 F.2d 162, 164-65 (6th Cir. 1985).

which an agency determines will normally require an EIS, do not always require an

EIS."); *Citizens Advisory Comm. on Private Prisons*, 197 F. Supp. 2d at 260-61

(same); *cf.* Guidance Regarding NEPA Regulations, 48 Fed. Reg. 34263, 34265

(July 29, 1983) (advising agencies to define broad categories of actions for

categorical exclusion in order to provide them "with sufficient flexibility to make

decisions on a project-by-project basis with full consideration to the issues and

impacts that are unique to a specific project").

Here, TVA determined that this was not a case that would "normally"

require an EIS because:  (1) gas units would be substituted for coal-fired units,

resulting in no increase in environmental effects; (2) the gas units would be built

on the existing Paradise reservation, which has been an industrial power-generating

site since 1963; and (3) the project would yield substantial environmental benefits

including a reduction in air emissions, water withdrawals and waste water

discharges, and coal combustion waste.  (AR 189-90.)  This determination, which

constitutes TVA's interpretation of its own rule, is due substantial deference.  *See,*

*e.g.*, *Auer v. Robbins*, 519 U.S. 452, 461 (1997); *Thomas Jefferson Univ. v.*

*Shalala*, 512 U.S. 512, 512 (1994) ("This broad deference is all the more warranted

when . . . the regulation concerns 'a complex and highly technical regulatory

program,' in which the identification and classification of relevant 'criteria

necessarily require significant expertise and entail the exercise of judgment

50

grounded in policy concerns.'" (quoting *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 697 (1991))).

TVA's application of this procedure to the specific facts of the Paradise project is consistent with past practice. If gas generation is proposed to be constructed on a greenfield site, TVA has prepared an EIS to support those activities. *See, e.g.*, Scoping Notice, EIS for Addition of Electric Generation Peaking and Baseload Capacity at Greenfield Sites, Haywood County, Tennessee, 64 Fed. Reg. 29935-02, 29935 (June 3, 1999) and Notice of Record of Decision, Addition of Electric Generation Peaking Capacity, 65 Fed. Reg. 30469-02, 30470 (May 11, 2000) (noticing addition of up to 1,400 MW by constructing simple-cycle combustion turbines at a greenfield site); Notice of Intent, EIS for Addition of Electric Generating Peaking Capacity at Greenfield Sites, Mississippi, 65 Fed. Reg. 47817-01 (Aug. 3, 2000); Record of Decision, 66 Fed. Reg. 21189-01 (Apr. 27, 2001) (noticing planned construction of a new simple-cycle gas plant "on a previously *undeveloped*, *greenfield* site" (emphasis added)). TVA interprets its NEPA guideline 5.4.1 to require the preparation of an EIS for these actions because they would have resulted in net environmental impacts rather than benefits.

For projects substituting gas generation for coal generation at existing industrial sites, TVA has prepared EAs. *See, e.g.*, EA for John Sevier Fossil Plant,

51

Addition of Gas-Fired Combustion Turbine/Combined-Cycle Generating Capacity
and Associated Gas Pipeline (AR 2726 (proposing to construct a new combined
cycle facility at John Sevier fossil facility to comply with a court order in *North
Carolina ex rel. Cooper v. TVA*, 593 F. Supp. 2d 812, 832 (W.D.N.C. 2009), *rev'd
and remanded*, 615 F.3d 291 (4th Cir. 2010), and a consent decree filed in a related
case, *Alabama v. TVA*, No. 3:11-cv-170, Doc. 15 (E.D. Tenn. June 30, 2011),
which required retirement of the John Sevier fossil units by December 31, 2012));
FONSI and SEA for the Potential Upgrade of the Tenaska Site for Establishing a
Simple-Cycle or Combined-Cycle Electric Generating Facility, Haywood County,
Tennessee, *available at*

http://www.tva.gov/environment/reports/lagoon_creek/2007-

29_lagoon_creek_fonsi.pdf (FONSI issued for constructing a new gas-fired CC/CT

plant at an existing generating site adjacent to TVA's Lagoon Creek facility).

TVA's application of its procedure here was not arbitrary or capricious, nor
was it a "new rule" that TVA issued without following appropriate APA
procedure, because it was consistent with past practice.  *See, e.g.*, *Stew Leonard's
v. Veneman*, 32 F. App'x 606, 607 (2d Cir. 2002) (affirming ruling that milk
handler was not a "producer-handler" because Secretary of Agriculture's
application of regulation was consistent with past interpretations); *Hospira, Inc. v.
Burwell*, No. GJH-14-02662, 2014 WL 4406901, at *11-15, 18 (D. Md. Sept. 5,

2014) (rejecting challenge to authorization of generic drug because application of statute and regulations "was entirely consistent with the FDA's past practice" and was not a new rule adopted without notice and comment rulemaking).  Even were the application here somehow "new," the regulation was deliberately drafted to give  TVA discretion to assess the actions on a case-by-case basis.  The retention of such discretion is not arbitrary or capricious.  *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 520-21 (2009) (holding FCC's decision to retain some discretion in enforcing its indecency ban based on the "patent offensiveness of isolated expletives on a case-by-case basis is not arbitrary or capricious").

Kentucky Coal suggests impropriety in TVA's offering of several reasons for its decision to issue an EA for the Paradise project.  The decision to issue an EA rather than an EIS is a factual decision implicating an agency's expertise; therefore, it is logical that several reasons support that decision.  There is nothing inconsistent between TVA's statements on this issue in the EA and the additional reasons that TVA elaborated throughout this lawsuit.

Kentucky Coal accuses TVA of attempting to "moot in advance" any criticism of its preparation of an EA when it explained that its NEPA procedure 5.4.1's reference to "major power generating facilities" is for the "construction of such facilities, not their continued operation."  (Doc. 20 at 48.)  Because much of the Paradise plant reservation, including the powerhouse, the wastewater pond

system, the switch yard and the coal handling facilities, would "continu[e to] operate" under either proposed alternative, this statement in the EA was correct. (AR 283.)  Kentucky Coal focuses on TVA's response in the EA to a comment made by several environmental advocacy groups regarding Alternative B.  The environmental groups commented that because Paradise was a "major generating facility" under the Clean Air Act, installing controls on the two coal units required an EIS under TVA's NEPA Procedures.  (AR 10074.)  In responding to the environmental groups, TVA stated that while the Paradise coal plant was a "major emitting facility" under the Clean Air Act, this did not mean it was a "major power generating facility" under TVA's NEPA procedures.  TVA explained that it interprets this provision to "apply[] to construction of a new major power generating facility, and not to maintenance and upgrades of existing major power generating facilities."  (AR 303.)  The environmental groups' comment, and TVA's response, were in the context of upgrading the two coal units by installing pollution control devices on them (Alternative B), not replacing their generation with natural gas (Alternative C).  Because neither Kentucky Coal nor any other commenter asked during the EA public comment period whether replacing the two coal-fired units with a gas plant was an action that "normally" requires an EIS, TVA had no occasion to address the question.**32**

---

**32**    Project opponents are not allowed to complain about an agency's response to

54

Kentucky Coal cannot re-write TVA NEPA procedure 5.4.1 and then accuse TVA of inappropriately applying it. The procedure deliberately includes the word "normally" to give TVA flexibility to apply the procedure to wide-ranging actions. In this case, TVA employed its expertise and experience in determining whether this was a situation that would "normally" require an EIS. Given the fact that the gas plant would be built on an already-established industrial site; that much of the Paradise Plant infrastructure as well as Unit 3 would remain in place; and that replacing two coal units with gas generation would have benefits to air and water quality as well as reduce the production of coal combustion waste, TVA concluded correctly that this was not the type of project that "normally" requires an EIS.

## 2. TVA's examination of context and intensity properly lead to a finding of no significance.

Determination of "significance" is made by considering context and intensity. 40 C.F.R. § 1508.27(a), (b). Intensity is assessed by considering possible impacts in ten areas that include public health or safety; unique characteristics of the geographic area; the uncertainty of effects; the degree of controversy over the effects on the quality of the human environment; effects on

---

(. . . continued)
an issue when they have failed to raise it in a way that brings it to the agency's attention during the review process in time for the agency to address it. *See Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council*, 435 U.S. 519, 553-54 (1978).

historical or culturally significant resources; and the effects on endangered or threatened species.  *Id.*  "Presence of enumerated intensity factors does not mandate a finding of significance; rather, the agency must establish only that it addressed and evaluated the factors."  *Del. Audubon Soc'y v. Salazar*, 829 F. Supp. 2d 273, 284 (D. Del. 2011).

Contrary to Kentucky Coal's assertions, and as the district court correctly found, "[a] review of the EA reveals that TVA considered the intensity factors and determined that the natural gas alternative would not have a significant adverse effect on the human environment, but would produce significant benefits [such that] TVA's determination [of no significance] was not arbitrary and capricious." (RE 55, PageID # 591.)  The EA tiers off and furthers the 2011 IRP's plan for sustainable provision of affordable electricity and is consistent with the EPA's findings as to MATS' impacts on electricity prices, *see* National Emission Standards for Hazardous Air Pollutants from Coal- and Oil-Fired Electric Utility Steam Generating Units, 77 Fed. Reg. 9304, 9439 (Feb. 16. 2012).

Moreover, the EA looked at employment impacts on the labor market in Muhlenberg County and all adjacent counties.  (AR 262-69.)  Although TVA concluded that the gas alternative would cause some adverse impacts to employment, TVA's tax equivalent payments to the state would increase because the value of the gas units would be higher than the existing fossil units.  (AR 268.)

56

Such socioeconomic impacts cannot alone drive an agency to prepare an EIS. *E.g.*, 40 C.F.R. § 1508.14 ("[E]conomic or social effects are not intended by themselves to require preparation of an environmental impact statement."); *Breckinridge v. Rumsfeld*, 537 F.2d 864, 867 (6th Cir. 1976) (communities' economic and social problems resulting from Army's base closure did not require an EIS because injuries were too attenuated from impacts to the physical environmental); *see also Goodman Grp., Inc. v. Dishroom*, 679 F.2d 182, 185 (9th Cir. 1982) (holding impacts to cultural resource and aesthetics alone are insufficient to trigger an EIS).

## CONCLUSION

TVA's employment of the 2011 Integrated Resource planning process is a reasoned means to fulfill the Energy Policy Act's least-cost planning directive because it comprehensively addresses necessary features for system operation, including diversity, reliability, dispatchability, and other factors of risk. The site-specific decision to retire Paradise Units 1 and 2 is supported by the IRP's broad goals, including decreasing TVA's reliance on coal in order to better balance its energy resource portfolio.

TVA tiered from that IRP to take the requisite "hard look" at Kentucky Coal's preferred alternative of installing emission controls and continuing to operate Paradise's two coal units in its site-specific EA of the Paradise action. The EA demonstrated that replacing those coal units with natural gas generation instead

of installing additional air pollution controls on them would have substantially less environmental impact and would promote a more balanced and diversified portfolio of energy resources on the TVA system. That TVA's decision is not the one that Kentucky Coal wanted is not the appropriate test. NEPA is not a means to force agencies to adopt a plaintiff's preferred option. *See Pure Waters, Inc. v. Mich. Dep't of Natural Res.*, No. 95-1498, 1996 WL 180178, at *2 (6th Cir. Apr. 15, 1996) (affirming dismissal of NEPA challenge because "plaintiff's real complaint seems to be that the city commission failed to adopt what [the plaintiff] sees as the better alternative"). Rather, TVA's decision can only be set aside if it was "arbitrary or capricious." It is not. Accordingly, the district court's judgment for TVA should be affirmed.

Respectfully submitted,

*s/Frances Regina Koho*
Edwin W. Small, Deputy General Counsel
Maria V. Gillen, Senior Attorney
Regina Koho, Attorney
TVA GENERAL COUNSEL'S OFFICE
400 West Summit Hill Drive
Knoxville, Tennessee 37902-1401
Telephone 865.632.2410

Attorneys for Tennessee Valley Authority

30753365

58

# CERTIFICATE OF COMPLIANCE

I certify that the foregoing brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 13,341 words excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), and complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared using Word 2007 in Times New Roman (14 point) proportional type.


*s/Frances Regina Koho*
Attorney for Tennessee Valley Authority

## CERTIFICATE OF SERVICE

I certify that on May 6, 2015, the foregoing document was electronically filed and served by operation of the Court's CM/ECF system on the following attorney of record for Plaintiffs-Appellants in this matter:

> Donald J. Kelly, Esq.
> Lisa C. DeJaco, Esq.
> Wyatt, Tarrant & Combs, LLP
> 500 W. Jefferson Street, Suite 2800
> Louisville, Kentucky 40202
> Telephone: (502) 589-5235
> Facsimile: (502) 589-0309
> dkelly@wyattfirm.com
> ldejaco@wyattfirm.com

*s/Frances Regina Koho*
Attorney for Tennessee Valley Authority

## APPELLEE TENNESSEE VALLEY AUTHORITY'S DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

| Record Entry | Document Description | Page ID # Range |
|---|---|---|
| | | |
| 1 | Complaint | 1-40 |
| 17 | Plaintiffs' Motion for Preliminary Injunction | 67-186 |
| 24 | Answer | 231-251 |
| 31 | Nicholson Declaration Certifying Administrative Record | 269-270 |
| 31-1 | Administrative Record Document Index | 271-283 |
| 31-3 | Court Receipt of Administrative Record on DVD disks | 285 |
| 32 | TVA's Motion for Judgment on the Administrative Record | 286-331 |
| 33 | TVA's Opposition to Plaintiffs' Motion for Preliminary Injunction | 333-356 |
| 38 | Plaintiffs' Reply in Support of Preliminary Injunction | 369-383 |
| 46 | Plaintiffs' Cross-Motion for Judgment on the Administrative Record | (filed under seal) |
| 49 | TVA's Reply in Further Support of Its Motion for Judgment on the Administrative Record and in Opposition to Plaintiffs' Cross-Motion for Judgment | 458-500 |
| 49-1 | Excerpt from EIS for Tullahoma Tennessee CC plant | 501-503 |
| 51 | Memorandum Opinion and Order Denying Plaintiffs' Motion for Preliminary Injunction | 508-532 |
| 52 | Plaintiffs' Reply in Support of Cross-Motion for Judgment on the Administrative Record | (filed under seal) |
| 53 | Memorandum Opinion and Order Granting TVA's Motion for Judgment on the Administrative Record and Denying Plaintiffs' Cross-Motion for Judgment on the Administrative Record | 550-578 |

| 54 | Judgment | 579 |
| 55 | Amended Memorandum Opinion and Order | 580-608 |
| 56 | Amended Judgment | 609 |
| 57 | Notice of Appeal | 610-611 |
| 61 | Order Denying Plaintiffs' Motion for a Stay Pending Appeal | 648-654 |