CASE NO. 15-5163

_____

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

_____

KENTUCKY COAL ASSOCIATION, INC., et al.

*Plaintiffs - Appellants*

v.

TENNESSEE VALLEY AUTHORITY,

*Defendant – Appellee*

On Appeal from the United States District Court
for the Western District of Kentucky

Civil Action No. 4:14-CV-73-JHM

_____

REPLY BRIEF OF APPELLANTS
KENTUCKY COAL ASSOCIATION, INC.;
JAMES ROGERS, III; J. L. ROGERS FAMILY, LLC;
TALMAGE ROGERS; TALMAR OF FL, LLC;
PAT EARLY; KIRSTINE EARLY; BUCKINGHAM HOLLOW, LLC;
KEVIN LAWRENCE; AND BIG BUCKS, LLC

_____

Donald J. Kelly
Lisa C. DeJaco
WYATT, TARRANT & COMBS, LLP
500 W. Jefferson Street, Suite 2800
Louisville, Kentucky 40202
Telephone:  (502) 589-5235
Facsimile:  (502) 589-0309
*dkelly@wyattfirm.com*
*ldejaco@wyattfirm.com*
*Attorneys for Appellants*

# **TABLE OF CONTENTS**

**Page**

TABLE OF CONTENTS ................................................................ ii

TABLE OF AUTHORITIES ........................................................ iii

ARGUMENT............................................................................1

I.    NOTHING IN THE ADMINISTRATIVE RECORD SHOWS
      THE PARADISE DECISION IS THE RESULT OF THE
      LEAST-COST PLANNING MANDATED BY THE TVA ACT........2

II    TVA SHOULD HAVE CONDUCTED AN EIS................................10

      A.    TVA Does Not Have the Discretion to Ignore Its
            Own Procedures.  .............................................................11

      B.    TVA Improperly Segmented the Project.  ................................14

CONCLUSION............................................................................18

CERTIFICATE OF COMPLIANCE .............................................21

CERTIFICATE OF SERVICE......................................................22

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Simmons v. Block,* 782 F.2d 1545 (11th Cir. 1986)..........................................11

*Thomas Radio Co. v. FCC,* 716 F.2d 921 (D.C. Cir. 1983).........................11

*City of Dallas v. Hall*, 562 F.3d 712 (5th Cir. 2009).....................................12

*Stew Leonard's v. Veneman,* 32 Fed.App's 606 (2d Cir. 2002)....................14

*Hospira, Inc. v. Burwell,* 2014 WL 4406901
    (D. Md. Sept. 5, 2014).........................................................................17

*Coal. For Advancement of Reg'l Transp. v. Fed. Hwy Admin.*
    576 Fed. Appx. 477 (6th Cir. 2014) ....................................................17

*Klein v. U.S. Dep't of Energy,* 753 F3d 576 (6th Cir. 2014).........................15

STATUTES

16 U.S.C. §831 .......................................................................................10

42 U.S.C. §4332 .....................................................................................15

ADMINISTRATIVE REGULATIONS

40 C.F.R § 1506.1 ..................................................................................15

46 Fed. Reg. 18026 ................................................................................15

## **ARGUMENT**

TVA made a hasty and unsupported decision when it reversed course and used looming new MATS requirements as an excuse to replace the existing coal-fueled Paradise Units 1 and 2 with a new natural gas-powered facility. In order to launch its project in time to meet the impending MATS deadlines, TVA short-changed the least-cost planning and environmental impact analyses that its own governing statutes and regulations called for in connection with this major federal action.[1] Having done so, TVA is now at a loss to locate any material in the Administrative Record to evidence those analyses or support its conclusion.

Unable to defend its own conduct, TVA demonizes the Landowners as fighting the "War on Coal." The Landowners and co-appellant Kentucky Coal Association have not pretended to be neutral on the policy question of whether to exchange coal-fueled power generation for natural gas generation, given risks ranging from the environmental effects of fracking to the potential for price spikes. But that policy question is not before this Court, and the Landowners' desire to see stable, cost-effective coal-fueled

---

[1] The long-planned and budgeted filter system at Paradise could have been achieved within a year's extension on the then-established MATS deadline, but construction of the CC/CT plant TVA chose was estimated to run beyond the longest-available two-year extension. [AR 12 at 345.]

power generation continue in the heart of western Kentucky coal country does not disqualify them from raising TVA's failures to follow proper procedures. If TVA had complied with its governing statutes and regulations in the first instance, it would not be defending an unsupportive record with ever-changing arguments.

The question before this Court is whether TVA must abide by the requirements of the law when implementing its preferred policy. The Landowners submit that however worthy and beneficial TVA believes its end result to be, TVA must follow the law. The Administrative Record offers no evidence that TVA has done so.

## I.    NOTHING IN THE ADMINISTRATIVE RECORD SHOWS THE PARADISE DECISION IS THE RESULT OF THE LEAST-COST PLANNING MANDATED BY THE TVA ACT.

In the spring of 2011, the TVA Board of Directors approved an Integrated Resource Plan and its associated EIS, a system-wide plan that recommended the retirement of up to 4,700 MW of coal-fueled power generation. In the winter of 2011-12, EPA finalized and published MATS. In August 2012, the TVA Board of Directors approved a budget that included the funding to upgrade the existing emission controls at Paradise Units 1 and 2 by installing pulse jet fabric filter systems. To the extent that the 2011 IRP

represents TVA's least cost planning, it is consistent with the ongoing operation of Paradise Units 1 and 2.

TVA suggests that its August 2012 approval of the plan for a jet pulse fabric filter system at Paradise was merely preliminary, because it was contingent upon "the satisfactory completion of required environmental reviews." [AR 324, 326.] But the environmental review of that plan – denoted Alternative B in the Environmental Assessment – found there would be no significant environmental impacts from installing the filter system to comply with MATS.[2]

TVA maintains that even though the planned filter system would comply with MATS without significant impact on the environment at a much lower cost, it chose to develop and select an alternative in order to deliver cost-effective electricity and to maintain a balanced portfolio of energy sources. [Doc. 22, PageID# 14.] TVA says this decision was supported by the 2011 IRP and its associated EIS. But as the Landowners

---

[2] Moreover, the EA's stated purpose and need for the action specifically included maximizing the use of existing TVA facilities, and minimizing new construction of transmission system components  [AR 34] – both of which could have been accomplished with the installation of the filter system, and neither of which are served by the new CC/CT plant. Another purpose and need was minimizing overall costs, and yet the "Project Cost Comparison" shows the filter system would cost $684 million compared to $1.055 billion for the new CC/CT plant. [AR 12 at 345.]

3

have already shown in detail in their principal brief, the CC/CT alternative to Paradise Units 1 and 2 was never contemplated by the IRP, and converting Paradise's power generating capacity from coal to gas pushes TVA far beyond the Recommended Planning Direction generated by the IRP. [Doc. 20, PageID# 34-39.]

TVA's 2011 IRP never contemplated (much less analyzed) replacing Paradise Units 1 and 2 with a natural gas-fueled facility. TVA can point to no support anywhere within the IRP for that decision,[3] while the strong circumstantial evidence – namely, the Board of Directors approving the installation of jet pulse fabric filters at Paradise Units 1 and 2 in 2012, when the IRP was freshly completed – indicates that those units were among those that TVA's models expected to stay in operation. This is further supported by the fact that TVA has a number of coal-fueled units that require much more modernization than do Paradise Units 1 and 2, and the Paradise Units are two of the three most economical units to operate in the entire TVA fleet, regardless of fuel type.

---

[3] The IRP did not break out its systematic discussions by unit, but it showed that TVA had made various portfolios of its assets and used those portfolios to model for costs. [AR 21 at 1819-40 (Chapter 8, "Final Study Results and Recommended Planning Direction").] The details of those asset portfolios and  cost modeling were not disclosed in the 2011 IRP, and hence are not part of this Administrative Record.

TVA now argues that implementing a natural gas alternative at Paradise would significantly decrease emissions, especially greenhouse gas emissions, significantly reduce water withdrawals and wastewater discharges, and reduce solid waste. [Doc. 22, PageID# 17-18, 19, 32.] But these were all factors considered in the 2011 IRP, wherein TVA conducted extensive system-wide modeling and concluded that the optimal amount of coal-fueled generation to be retired is 4,700 MW. It is double-counting to rely on those costs again in support of the Paradise decision – which goes far beyond the RPD with respect to total coal-fueled generation to be retired. The IRP specifically stated in Chapter 9, titled "Next Steps," that TVA should "[p]erform detailed optimization analyses to determine both the optimum level of idling and the best units for idling after accounting for risks, uncertainty and all known costs." [AR 21 at 1846.] TVA has seized on the indication that further analysis might support an additional increase in coal-fueled idling without ever acknowledging that TVA did not, in fact, conduct the analyses the IRP called for.

TVA concluded in the Paradise EA that replacing Units 1 and 2 with a CC/CT plant would promote a more balanced and diversified energy portfolio, "thereby fulfilling the 2011 IRP's goals." [Doc. 22, PageID# 19.] But the goals of the 2011 IRP did not exist in a vacuum. They were

5

supported by a detailed and systematic analysis, which called for additional studies that TVA did not perform before deciding to swap coal for gas at Paradise, and which culminated in a Recommended Planning Direction that TVA abandoned in order to pursue its newly preferred alternative. Saying that the Paradise decision serves the "goals" of the 2011 IRP is lip service at its most sublime.

The 2011 IRP looked at costs on a system-wide basis, but it explicitly called for more analysis to determine which of its coal-fueled generating units would be appropriate to idle when idling up to 4700 MW of coal-fueled generating capacity, and more modeling of cost impacts across the entire system resulting from idling more than 4700 MW of generating capacity to determine if that could be justified. Certainly the IRP did not model the entire system as to unit utilizations and operations with respect to whether Paradise would operate Units 1 and 2 or a CC/CT plant not contemplated at the time. Indeed, nothing in the Administrative Record shows the system-wide effects of replacing coal-generated power at Paradise with natural gas. Contrary to TVA's portrayal of its contents, the board presentation document "Paradise 1-2 Evaluation Summary" [AR 12] looks only at the costs to be incurred at Paradise, not system-wide (and does not find the CC/CT plant to be the least cost alternative).

In addition to the filter system for Paradise Units 1 and 2 and the CC/CT plant, AR 12 reports the results of considering a third possible option – building a four-combustion turbine plant, the projected cost of which was $561 million, as opposed to $1.055 billion for the CC/CT plant. [AR 12 at 345.] The total costs associated with that alternative were $1.576 billion, compared to $2.384 billion for TVA's preferred alternative. [AR 12 at 362.][4] TVA is quite correct when it says that the least-cost planning responsibility imposed by § 113 is to provide adequate and reliable service at the lowest system cost, not the lowest cost of individual energy resources. [Doc. 22, PageID# 25.] But this Administrative Record does not indicate that the Paradise decision is least-cost in either respect.

AR 12 illustrates TVA's failure to do system-wide least-cost planning in connection with the Paradise decision, and highlights the holes in TVA's arguments. TVA argues that replacing Paradise Units 1 and 2 with a CC/CT plant will give TVA crucial flexibility, because gas generation is more suited to meet "swing" energy needs while Paradise Units 1 and 2 are most

---

[4] The total cost projected for installing controls at Units 1 and 2 is projected at $3.669 billion: that number includes $2.255 billion in "Fixed O&M" and "Plant Capital" costs, which the document labels as "estimates" to comply with "expected but not yet final" environmental regulations. The Administrative Record has no underlying data detailing or supporting those estimates, or further identifying the putative future regulations.

efficient while generating at capacity. [Doc. 22, PageID# 33.] But AR 12 shows that TVA assumed that (but for a short period dropping into the 60-percents) the base capacity factors of the proposed CC/CT plant would be in the same 70-80 percent range as the Paradise Units would operate (and have operated). [AR 12 at 355.] These are capacity factors of a base-load plant. By contrast, TVA assumed the turbine-only plant would operate with much lower base capacity factors – in the 10 to 30 percent range – meaning they would cycle off and on. Even though the turbine-only plant would have been consistent with what TVA now says was its objective - obtaining a plant that could better respond to varying power demands -  and at a lower cost, TVA did not select that alternative.

Assuming that TVA were accurately describing the purpose of the CC/CT plant, changing the power generation at Paradise from "baseload" to "intermediate" or "peak" generation would have effects that ripple through the entire system: low-cost baseload power generation would have to come from somewhere else in the system, and the cost of those shifts is nowhere considered in AR 12. Furthermore, while a turbine-only plant would only be called upon when needed, AR 12 shows that the CC/CT plant would substitute for the baseline power generation of Paradise Units 1 and 2.

The analysis reflected in AR 12 was not the kind of analysis required for least-cost planning. No document in the AR indicates that TVA has conducted any modeling of the entire system to determine whether replacing the indubitably cost-efficient and reliable Paradise Units 1 and 2, as opposed to TVA's other, less reliable, coal-fueled units, is the least-cost choice when replacing coal with gas generation. The Landowners' experts conducted an analysis of the entire TVA system, and concluded that the Paradise decision is <u>not</u> least-cost across the system as a whole. TVA can point to nothing to show the contrary. If TVA did further analyses, they are not part of this Administrative Record. Hence, TVA's conclusion that the Paradise decision is the product of least-cost planning is quintessentially arbitrary and capricious – that is, unsupported by the record.

TVA's position as to satisfying its least cost planning requirement is essentially: "We did lots of complicated math in the IRP, and all we had to do was complete the analysis. We have the discretion to ignore the Recommended Planning Direction it generated. We concluded that in isolation, a new natural gas facility at Paradise was cheaper, and defining 'cheaper' is also in our discretion." TVA is wrong on all counts. "Least system cost" is not a discretionary term. It is defined by statute, 16 U.S.C. § 831m–1 (3). TVA has some discretion in how to balance the factors it

analyzes in determining that cost, per 16 U.S.C. § 831m–1(2), but the factors themselves must be scientifically sound, and the mathematical analysis must be verifiable.

Today, as when TVA was created, TVA's service area extends over a part of the country with a high proportion of low-income citizens. The Act that created TVA did so with the explicit directive in 16 U.S.C. § 831m–1 that TVA should "provide adequate and reliable service to electric customers of the Tennessee Valley Authority at the lowest system cost,"– that is, power those customers could most easily afford to purchase. TVA relies on the 2011 IRP and the document identified as AR 12 to show that it engaged in the necessary least-cost planning. Neither document can meet the burden TVA must carry.

## II.    TVA SHOULD HAVE CONDUCTED AN EIS.

The NEPA arguments between the Landowners and TVA come down to two questions: Is it within TVA's discretion to ignore its own NEPA Procedures, without any explanation in the Administrative Record? And is it acceptable for TVA to issue a FONSI when a sizable component of the project has not been analyzed? The Landowners believe that under the law, the answer to both questions is No.

### A.    TVA Does Not Have the Discretion to Ignore Its Own Procedures.

Once again, TVA has failed to point to record evidence that can support its failure to abide by its own NEPA Procedure § 5.4.1, which specifically identifies "major power generating facilities" among the classes of actions that "normally will require" an EIS. TVA protests that "normally" does not mean "always" [Doc. 22, PageID# 58], and that position is accurate – as far as it goes. TVA had an obligation to explain, as part of the Administrative Record, why the Paradise decision was not "normal." TVA utterly failed to do so, and its defense to this Court is an equal failure.

TVA says that it is entitled to deference when it interprets its own regulations. [Doc. 22, PageID# 59.] But TVA's regulation is quite simple: if the project planned involves a major power generating facility, then an EIS is normally required. TVA has never tried to suggest that the construction of a new 1,000+ MW CC/CT unit is other than an action involving a major power generating facility, and indeed there is no significant agency expertise involved in that determination. Going beyond the plain language of the regulation to read in additional requirements is not a discretionary interpretation of the regulation; it is post hoc re-writing of the regulations of the sort that courts have decried as arbitrary and capricious conduct. *See, e.g., Simmons v. Block*, 782 F.2d 1545, 1550 (11th Cir. 1986); *Thomas*

*Radio Co. v. FCC*, 716 F.2d 921, 924 (D.C. Cir. 1983).

A case cited by TVA proves this point perfectly. TVA's Procedure §
5.4.1 (listing "major power generating facilities") can be compared with that
at issue in *City of Dallas v. Hall*, 562 F.3d 712, 722 (5th Cir. 2009), where
the agency's list of "major actions normally requiring an EIS" included
"major new refuge system units … which involve substantive conflicts over
existing State and local land use [or] significant controversy over the
environmental effects of the proposal." Unlike the TVA here, the caveats to
the general rule were fully spelled out in the regulation itself, and
accordingly the agency had some discretion in terms of what qualified as a
"substantive conflict" or a "significant controversy." *Id.* TVA did not put
any caveats in its regulation. It did not put any caveats in the Administrative
Record. Instead, the qualifying conditions remained wholly hidden from the
public until the Landowners pressed TVA to explain itself in this litigation.[5]

---

[5] TVA's suggestion at Footnote 31 [Doc. 22, PageID# 58] that the
Landowners waived any argument that TVA has improperly internally
amended its procedures is astounding. TVA did not even suggest that it had
any internal policy or practice to forego an EIS for major new power
generating facilities on brownfield sites or when replacing coal with gas
before it asserted that argument for the first time in its reply brief in support
of its motion for judgment on the administrative record. In their own reply in
support of their cross-motion, the Landowners stated that "TVA's
explanation constitutes an improper effort to revise its own Procedures after
failing to apply them." [RE 52, PageID# 535.]

TVA cites AR 189-90 when it says that the Paradise decision was not one that would "normally" require an EIS because (1) gas would be substituted for coal-fired units, resulting in no increase in environmental effects, (2) the gas unit would be built on a brownfield site, and (3) the project would yield significant environmental benefits. The second of these three justifications is not even hinted at in AR 189-90, and while there is some discussion relative to the other two points, there is absolutely no indication in AR 189-90 that these are the bases for which TVA is (purportedly) exercising its discretion to bypass its own regulation to ordinarily perform an EIS for a major power generating facility.[6]

TVA says its decision not to conduct an EIS at Paradise is not arbitrary and capricious because it is consistent with TVA's prior practice. [Doc. 22, PageID# 60-61.] TVA has listed several past instances in which it has prepared an EIS for construction on greenfields, and others where it conducted only an EA for projects substituting gas generation for coal. The problem with this "prior practice" defense (other than its omission from the

---

[6] The only places in the EA where TVA addressed the application of its regulation were in Appendix A, where it stated that the EIS requirement for "major power generating facilities" refers to the "construction of such facilities, not their continued operation" [AR 283-84], and in response to public comments, when TVA called the new construction a "maintenance and upgrade." [AR 303.]

regulation itself) is that it is wholly absent from the Administrative Record. If TVA had set forth that same discussion within the EA, it could have been reviewed by interested members of the public and would have been subject to public comment, which might have resulted in a full fleshing out of the details regarding TVA's other projects compared to the Paradise decision.

Once again, TVA's cited authority proves the case against it. In *Stew Leonard's v. Veneman*, 32 Fed. App'x 606, 607 (2d Cir. 2002), there was substantial evidence within the administrative record discussing the Secretary of Agriculture's narrow definition of its own regulation and the reasons that the applicant did not meet the standard. Likewise, in *Hospira, Inc. v. Burwell*, 2014 WL 4406901 at *14 (D. Md. Sept 5, 2014), the agency specifically discussed its past practice of applying its regulation and explained how that practice applied to the case at hand within the administrative record. TVA did not do so in this case. Accordingly, its failure to abide by its own Procedure is quintessentially arbitrary and capricious, that is, unsupported by record evidence.

**B.    TVA Improperly Segmented the Project.**

TVA makes no real effort to convince this Court that the natural gas pipelines needed for its new CC/CT plant do not come within the 40 C.F.R. § 1508.25 definition of a connected action. Instead, TVA assures this Court

14

that it will cooperate with FERC's environmental analysis of the pipelines, and that FERC's NEPA reviews are comprehensive and include mitigation measures where appropriate. [Doc. 22, PageID# 43, 45.] That is well and good, but it does nothing to excuse TVA's failure to consult with FERC in conjunction with its own Environmental Assessment.

When two agencies have overlapping areas of expertise and jurisdiction related to a federal action, they are to coordinate their assessments at the earliest possible stage "to insure an early and comprehensive analysis of the direct and indirect effects of the proposal and any related actions… so that all the relevant agencies can work together…." 46 Fed. Reg. 18026 at No. 9; *see also* 42 U.S.C. § 4332. TVA did not follow that directive. 40 C.F.R. § 1506.1(a) says "no action concerning the proposal shall be taken which would … [h]ave an adverse environmental impact" or "[l]imit the choice of reasonable alternatives" until the entire NEPA review process is completed. Clearly, TVA's actions to launch the construction of a billion-dollar natural gas-fueled generating plant will limit FERC's choices when it comes to the environmental assessment of whether to permit the

pipelines that will service that plant.[7]

TVA states in Footnote 20 that waiting for FERC's process to be completed would have taken TVA past the MATS compliance deadline to implement Alternative C. [Doc. 22, PageID# 44.] This admission inadvertently reveals the full story. If TVA could not comply with NEPA, meet the MATS deadline, <u>and</u> implement Alternative C, something had to give. TVA chose to gloss over the NEPA requirements in order to cram though its new natural gas plant on the pretext of MATS compliance.

TVA repeatedly says that it did as much environmental analysis as it could, given that the pipeline routes were uncertain. TVA is willfully missing the point. The existence of the pipeline is a given and a fundamental element of the CC/CT plant. Accordingly, TVA had an obligation to identify and analyze the pipeline routes before it could fairly say that the CC/CT plant would have no significant impacts on the environment.

Alternatively, whether or not the pipeline corridor was fully defined, TVA could have conducted an EIS and considered the possible impacts in the context of potential benefits – the course followed by the governmental

---

[7] Indeed, even as of today, while TVA is expending tens of millions of dollars to construct the new CC/CT plaint, FERC has not issued its environmental assessment of the pipelines.

agency in *Coal. for Advancement of Reg'l Transp. v. Fed. Hwy. Admin.,* 576
Fed. Appx. 477, 491 (6th Cir. 2014), a case mistakenly relied upon by the
District Court to approve TVA's actions. TVA chose not to follow the
course of CART, no doubt because an EIS would have taken as long if not
longer than a proper consultation with FERC. But balancing impacts against
benefits is inappropriate for an EA, even if an EA was all that TVA had time
for.

Lack of proper planning on TVA's part does not create a "Get Out of
NEPA Free" card. Nothing forced TVA to consider or adopt Alternative C in
order to comply with MATS. Rather, the environmental review of TVA's
original MATS-compliance plan was properly found to have no significant
impacts. The law does not allow TVA – or any other governmental agency –
to take advantage of uncertainty in order to skimp on NEPA analysis, no
matter what its other timelines may require.

TVA points to *Klein v. U.S. Dep't. of Energy*, 753 F.3d 576 (6th Cir.
2014) to assert that "[i]f an EA is appropriate for a new biorefinery plant, so
too is an EA appropriate" for the Paradise decision. [Doc. 22, PageID# 57.]
Once again, TVA is willfully missing the point. Except that it involved
construction of a new industrial facility, *Klein* is utterly inapposite to the
facts at bar: there were no previously-established plans being changed with

17

unseemly haste or recommended planning directions being ignored, no internal agency regulations being given short shrift with only an inherently inaccurate and ever-changing explanation, and no connected elements of the project being set aside for future review by another agency. All that *Klein* shows is that if TVA had an entirely different fact pattern to defend – if it had written its "previous practice" into its regulations, or explained it within the administrative record, and if TVA had allowed FERC to conduct its environmental analysis in time to include the results in TVA's EA – perhaps TVA's FONSI would have been justified, and supported by substantial record evidence. But that hypothetical case is entirely different from the facts at bar, and its outcome must be equally different.

## CONCLUSION

A common thread runs through the positions TVA has taken in response to the Landowners' litigation: disregard – for its least cost planning obligation, for its own IRP and Recommended Planning Direction, for its own NEPA Procedures, and for its obligation to obtain FERC's input during its own environmental analysis. This disregard is a reflection of TVA's attitude in making the Paradise decision, where TVA disregarded its own IRP's directive to conduct unit-by-unit analyses before deciding which coal-fueled units to retire, and disregarded its own existing plan to install jet pulse

fabric filters to timely comply with MATS at Paradise, and disregarded the fact that construction of a new natural-gas plant would run beyond even the most generous projected MATS deadline extension. Despite all of this, TVA decided that MATS compliance was a prime opportunity to retire two of the most efficient and cost-effective units in the entire TVA system, as part of TVA's massive and unsupported rush to replace coal-fueled generation with gas.

The Administrative Record shows plainly that TVA pushed through the Paradise decision without taking the proper procedural steps. TVA did not engage in appropriate system-wide least-cost planning per the TVA Act and did not conduct the EIS its own Procedures would normally require. In order to issue a FONSI as to the new CC/CT plant, TVA pretended that the construction of natural gas pipelines without which the plant will not function was other than a certainty, and thus the environmental impacts could be examined at some later date by another federal agency. The Paradise decision is not supported by substantial evidence in the record as to TVA's obligations under the TVA Act or NEPA. TVA's decision is arbitrary and capricious.

Respectfully submitted,

s/ Lisa C. DeJaco
Donald J. Kelly
Lisa C. DeJaco
Wyatt, Tarrant & Combs, LLP
500 W. Jefferson Street, Suite 2800
Louisville, Kentucky 40202
Telephone:  (502) 589-5235
Facsimile:  (502) 589-0309
*dkelly@wyattfirm.com*
*ldejaco@wyattfirm.com*

*Attorneys for Appellants*

# <u>CERTIFICATE OF COMPLIANCE</u>

1.     The undersigned hereby certifies that this brief complies with the type-volume limitation requirements of FRAP 32(a)(7)(B), as this brief contains 4,399 words according to a word count by the word-processing system used to produce this brief, exclusive of sections of this brief exempted by FRAP 32(a)(7)(B)(iii).

2.     The undersigned hereby certifies that this brief complies with the typeface requirements of FRAP 32(a)(5) and the type style requirements of FRAP 32(a)(6), as this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, font size 14.

s/  Lisa C. DeJaco
Lisa C. DeJaco
Wyatt, Tarrant & Combs, LLP
500 W. Jefferson Street, Suite 2800
Louisville, Kentucky 40202
Telephone:  (502) 589-5235
Facsimile:  (502) 589-0309
*dkelly@wyattfirm.com*
*ldejaco@wyattfirm.com*

*Attorneys for Appellants*

## **CERTIFICATE OF SERVICE**

It is hereby certified that on this 26th day of May, 2015, I filed the foregoing electronically via the CM/ECF filing system, which will effect service upon the following:

Edwin W. Small ewsmall@tva.gov
Maria V. Gillen mvgillen@tva.gov
Frances Regina Koho
frkoho@tva.gov
TENNESSEE VALLEY AUTHORITY
Office of the General Counsel
400 W. Summit Hill Drive
Knoxville, Tennessee 37902-1499
865-632-3021

s/ Lisa C. DeJaco
One of Counsel for Appellants

61345104.1

22